Robert Frederick HUFF and William Constantine Nicholson, Appellants,

v.

UNITED STATES of America, Appellee.

No. 18753.

United States Court of Appeals Fifth Circuit.

April 19, 1962.

Rehearing Denied July 23, 1962.

Holvey Williams, Daniel Y. Garbern, El Paso, Tex., for appellants.

Ernest Morgan, U. S. Atty., San Antonio, Tex., Lawrence L. Fuller, Asst. U. S. Atty., El Paso, Tex., for appellee.

Before JONES, BROWN and GEWIN, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

This appeal tests the conviction of Robert Huff and William Nicholson for violation of the Wire Fraud Statute, 18 U.S.C.A. § 1343, and conspiring to do so under 18 U.S.C.A. § 371. Defense counsel in ten Specifications of Error has put into question every step of the proceedings leading up to the judgment of conviction—from the indictment to the charge to the jury.[1] Finding no error in the law, and finding sufficient evidence to support the verdict, we affirm the judgment.

The events leading up to the alleged crime of 1960 began on September 17, 1957. The evidence indicated that on that date, Huff's apartment was burglarized. Cash and jewels said to value together

---

1. Ten Specifications of Error were urged as follows:

"I. The trial court erred in overruling defendants' supplemental motion to dismiss the indictment.

"II. The trial court erred in overruling defendants' motion for a bill of particulars.

"III. The trial court erred in refusing defendants' requested Charge No. One (defendants' special defense).

"IV. The court erred in overruling objections to the testimony of Nazry Abraham concerning (A) telephone conversations with Antonio Duran, relating what Antonio Duran said and did out of the presence of defendants Huff and Nicholson and (B) conversations of what Mexican police officers said and did out of the presence of either defendants on trial and without substantial evidence of a conspiracy.

"V. The court erred in overruling defendants' motion for acquittal filed at the close of the government's case and renewed at the close of the case.

"VI. The court erred in overruling defendants' motion for acquittal as to the conspiracy count.

"VII. The trial court erred in not giving defendants' Special Requested Charge No. Four.

"VIII. The prosecutor's question to a defense witness on cross examination was so highly prejudicial and improper that it constituted plain error.

"IX. The court erred in overruling defendants' objections to the testimony of Salim Abraham as to what he said and did, out of the presence of the defendants.

"X. The trial court erred in refusing defendants' Special Requested Charge No. Two."

$22,000 were alleged to have been taken. Although the record is totally lacking in any attempted explanation, Huff apparently thought it neither prudent nor advisable to notify any official of the burglary other than the manager of the apartments where he lived. Rather, the course of action which Huff chose to follow was to call one of his gambling companions, Nazry Abraham, who worked at a furniture store belonging to his father, Salim Abraham.[2] Huff then persuaded Nazry to deliver an air conditioner to his apartment. But when Nazry arrived at Huff's apartment and found Huff and Nicholson waiting, he soon learned that they were not interested in the air conditioner. Instead he was taken into the kitchen and accused of taking Huff's money and jewels. After stoutly denying any part in any burglary, he was released in a couple of hours after he promised to do all he could to help Huff find and regain possession of the jewels. Shortly thereafter Nazry received a call from "Tony."[3] Nothing further was done. From all that appeared the matter was closed. Nazry had no occasion to, nor did he, discuss the matter further with either Huff or Nicholson or anyone else until almost three years later.

On April 22, 1960, and apparently out of the blue, Nazry received a telephone call from Duran, then in Mexico, in regard to jewelry which Duran said belonged to, and was stolen from, Huff. In as many days Nazry received four additional international long distance calls from Duran. After each one, Nazry promptly called Huff to relay to him the conversation had with Duran. Also each time Huff attempted to persuade Nazry to go to Juarez, Mexico—just across the border—to meet Duran and see the jewels. Nazry testified that after Huff described some of the jewelry over the telephone, "he asked me to please act more or less like his agent and retrieve those so-called jewelry." Each time Nazry refused until finally on April 26, 1960, he consented to go to Juarez to see the jewelry. In a matter of minutes after he reached the designated rendezvous at the El Taurino Club, several men surrounded him with pistols and told him he was under arrest. These men were Mexican Federal Judicial Police officers.

Instead of being taken to the jail at Juarez, Nazry was driven some 30 or 40 miles to another town in Mexico known as Guadalupe. He was taken to what one witness described as a downtown tenement house, and which Nazry himself didn't know whether it was a house or a jail. In any event he was forcibly detained there. He testified that once inside, the men shouted at him, drew their pistols, and forced him to sign a confession. The substance of the confession was that he had in fact robbed Huff's apartment (in 1957). Nazry requested that the officers contact his father and Huff which they agreed to do.

Meanwhile Salim spent a sleepless night. His daughter-in-law called late to inquire about Nazry and to tell Salim that Nazry had not come home. Salim then spent the rest of the night looking for Nazry and checking the police and sheriff's departments, and the jails in both El Paso and Juarez. Finally, he received a call from Huff at 8:45 on the morning of April 27, 1960. Huff said he was in Juarez at the La Sevillano Restaurant and that he was waiting there to talk with Salim about Nazry.

When Salim arrived in Juarez, Huff informed him that Nazry was in the custody of the Mexican Federal Police, and that Nazry had robbed his apartment three years ago. Huff demanded $22,000 for Nazry's release. By this time the Mexican police who knew of the scheme began to gather around and, according to Salim, they suggested that Salim "pay the man [Huff] and forget it." But

2. To facilitate discussion and for purposes of clarity, we use the first names of father and son.

3. "Tony" was Antonio Duran who was a co-defendant. He was not under arrest and said to be in Mexico beyond the jurisdiction of the Court, and therefore not on trial.

Salim refused to make any deal until he saw his son.

Then they went outside and got into Nicholson's car and Nicholson drove them to Guadalupe. When they arrived at about 11:00 a. m. at the place where Nazry was being held, Huff in the presence of Salim asked Nazry if he had robbed Huff's apartment, and Nazry said yes —later explained by Nazry to be because of fear. When Salim saw that his son was all right, he was ready to talk business with Huff. By further discussion he was able to reduce Huff's demand from $22,000 to $12,000. Then Nicholson drove Huff and Salim to El Paso where Salim went to the bank and borrowed $15,000—$12,000 with which to satisfy Huff's demand and $3,000 for extra safety in case some of the others decided they wanted money also. Nicholson knew of the purpose of the trip back to El Paso and let Salim off at the bank.

Meanwhile that afternoon, a Mexican Federal Police Officer took Nazry to a little town on the border between Mexico and United States known as Caseta. Presumably this was the place where his "purchased" release was to take place. After they waited awhile and nothing developed, they took him to the Juarez jail at about 5:00 p. m., from which he was released later that evening.

When Huff and Nicholson let Salim out in El Paso, he told both of them to go back to the La Sevillana Restaurant, and he would return within an hour with the money. When Huff and Nicholson returned, they were arrested by the Juarez Secret Police, and held for four months before their release. Arrested also were the Mexican Federal Judicial Police Officers.

After their return from Mexico, Huff and Nicholson were indicted and tried for the Federal crimes charged here. After both were found guilty by a jury, Huff was sentenced to two years on each of the six substantive counts [4] to run concur-

---

4. "1. That prior to April 20, 1960, and continuing to on or about April 28, 1960, * * * HUFF, * * * NICHOLSON and ANTONIO DURAN devised * * * a scheme and artifice to defraud Salim Abraham and to obtain money by means of false and fraudulent pretenses, * * * well knowing at the time that the pretenses * * * would be false when made: That on various occasions, by telephone from Juarez, Chihuahua, Mexico, El Paso, Texas, * * * HUFF, * * * NICHOLSON and ANTONIO DURAN attempted to induce Nazry Abraham to go into Juarez, Chihuahua, Mexico, for the purpose of assisting the said * * * HUFF, * * * NICHOLSON and ANTONIO DURAN to recover jewelry taken in an alleged burglary of * * * HUFF'S apartment in El Paso County, Texas, three years previously, whereas in truth and in fact the said * * * HUFF, * * * NICHOLSON and * * * ANTONIO DURAN had conspired to obtain the arrest of * * * Nazry Abraham by Mexican authorities upon his entry into Mexico, for the purpose of representing to Salim Abraham, father of Nazry Abraham, that upon payment of $22,000.00 they would assist in the release of the said Nazry Abraham.

"2. On the 22nd day of April, 1960, * * * the defendants, * * * HUFF, * * * NICHOLSON, and ANTONIO DURAN, for the purpose of executing the aforesaid scheme and artifice, * * * caused sounds to be transmitted * * * from Juarez, Chihuahua, Mexico, to the City of El Paso, El Paso County, Texas, * * * by telephone, to Nazry Abraham."

The second through the sixth counts were the same as the first count shown above except that different telephone calls were alleged. The telephone call in count six was from Huff to Salim.

"Seventh Count. That commencing on or about April 20, 1960, and continuing thereafter until on or about April 28, 1960, * * * HUFF, * * * NICHOLSON and ANTONIO DURAN, having devised * * * a scheme and artifice to defraud Salim Abraham, and to obtain money by means of false and fraudulent pretenses, * * * unlawfully conspired, confederated and agreed together to transmit * * * and to cause sounds to be transmitted, by means of wire * * * from Juarez, Chihuahua, Mexico, to El Paso, Texas, for the purpose of executing such scheme * * * in violation of Section 1343 of Title 18, United States Code, and to effect the object of their said conspiracy they did the following acts:

"1. On * * * April 22, 1960, * * * Antonio Duran, at Juarez,

rently, and five years on the seventh (conspiracy) count to run consecutively with the sentence on the first six counts. Nicholson's sentence was five years on each of the seven counts to run concurrently. It is from that judgment that this appeal was taken.

Appellants' motions for acquittal raised the question of the sufficiency of the evidence.[5] However, the major point woven into most of the other points of error is that of the legal sufficiency of the indictment.[6] It is asserted that fraud or deceit is not alleged in the indictment. Rather, it is claimed, the scheme alleged was to extort money. That point is also raised in the argument on the sufficiency of the evidence by practically admitting all that took place, but saying that while such evidence may amount to extortion or coercion, there is no fraud shown and

therefore conviction under 18 U.S.C.A. § 1343 cannot stand. Great stress is laid on Fasulo v. United States, 1926, 272 U.S. 620, 47 S.Ct. 200, 71 L.Ed. 443, which held that extortion as such does not amount to a scheme to defraud under the Mail Fraud Statute, 18 U.S.C.A. § 1341. But that case itself demonstrates that it is not controlling here. Referring to a prior case [7] sustaining a mail fraud charge, the Court observed that " * * * there were involved trickery and deceit as well as threat." It was the presence of threats alone which the Court regarded as distinctive and decisive. For the Court commented that "if threats to kill or injure unless money is forthcoming do not constitute a scheme to defraud within the statute, there is none in this case. The only means employed by petitioner and his coconspirators to obtain the money demanded was the coercion of

* * * called Nazry * * * at El Paso, Texas, by telephone.

"2. On * * * April 22, 1960, in the afternoon, ANTONIO DURAN, at Juarez, * * * called Nazry * * * at El Paso * * *.

"3. On * * * April 23, 1960, ANTONIO DURAN, at Juarez * * * called Nazry * * * at El Paso * * *.

"4. On * * * April 24, 1960, and for several consecutive days thereafter. * * * HUFF and * * * NICHOLSON met with other persons * * * at the Sevillana Restaurant in Juarez * * *.

"5. On * * * April 25, 1960, ANTONIO DURAN, at Juarez * * * called Nazry * * * at El Paso * * *.

"6. On * * * April 26, 1960, ANTONIO DURAN, at Juarez, * * * called Nazry * * * at El Paso * * *.

"7. On * * * April 26, 1960, ANTONIO DURAN and Nazry * * * had a conversation at Club Taurino, Juarez, Chihuahua, Mexico.

"8. On * * * April 26, 1960, ANTONIO DURAN and Nazry * * * were arrested in Juarez, * * * and placed in a jail at Guadalupe * * *.

"9. On * * * April 27, 1960, * * * HUFF and * * * Nicholson, at Juarez, * * * called Salim * * * at El Paso, Texas, by telephone.

"10. On * * * April 27, 1960, at the Sevillana Restaurant, in Juarez, * * * HUFF and * * * NICHOLSON had a conversation with Salim * * *.

"11. On * * * April 27, 1960, * * * HUFF and * * * NICHOLSON drove Salim * * * by automobile to a jail in Guadalupe * * *.

"12. On * * * April 27, 1960, HUFF and Salim * * * had a conversation at a jail in Guadalupe * * *.

"13. On * * * April 27, 1960, * * * HUFF and * * * NICHOLSON drove Salim * * * by automobile from * * * Guadalupe, Mexico, to Fabens, Texas, then to the State National Bank in El Paso, Texas.

"14. On * * * April 27, 1960, Nazry * * * was removed from a jail at Guadalupe * * * and taken to a point * * * near Fabens, Texas.

"15. On * * * April 27, 1960, * * * HUFF and * * * NICHOLSON returned by automobile from El Paso, Texas, to Juarez, * * *.

"16. At the time and place above alleged, * * * HUFF, * * * NICHOLSON and ANTONIO DURAN devised the scheme alleged in the preceding counts of this indictment."

5. See Specifications of Error Nos. V and VI in footnote 1, supra.

6. See Specification of Error No. I.

7. Weeber v. United States, C.C.D.Col., 1894, 62 F. 740.

fear." 272 U.S. 620, 626, 628, 47 S.Ct. 200, 201, 202.

██ While the actions of Huff and Nicholson here may or may not have amounted to extortion, coercion, threats or kidnapping, they were not simply that. They were much more since a fraudulent scheme of implied or expressed misrepresentations could also be found in these actions. Muench v. United States, 8 Cir., 1938, 96 F.2d 332. In other words, for purposes of the Wire Fraud Statute fraud and extortion are not mutually exclusive. The mere fact that extortion may constitute one aspect of the transaction does not insulate the fraudulent representations and plan from prosecution as a scheme to defraud.

In the present case, once credited by the jury, the whole scheme from beginning to end amounted to trickery and deceit. The scheme revolved around luring the victim out of the United States and into Mexico. This was carried out as to Nazry by representing that certain jewels alleged to have been stolen had been found. Indeed, there was evidence from which the jury could find that the jewels had not been found, if they were ever stolen, and if they belonged to Huff in the first place. Huff also told Nazry that he wanted Nazry to go to Mexico as his agent and see the jewels, and that he would pay a nice price to get them back. Huff explained that he was too busy and too sick to go himself. The jury could find from the evidence before it that none of these representations were true.

Huff told Salim that Nazry had robbed his apartment, and he indicated that Nazry was under a legal arrest based on a legal complaint and that Huff could obtain his release for $22,000. The jury could find here also that some or all of these representations were untrue.

█ There is no requirement that the victim be actually deceived, but only that there be a scheme to defraud, and that the telephone be used as a step in the execution of the scheme.[8] Nor is it essential that the scheme be successful. The record in this case is more than ample to show that there was a scheme to defraud and that at least one jurisdictional telephone call was made in furtherance of that scheme.

█ We must therefore agree with the Trial Court that the indictment was sufficient as a matter of law and should not have been dismissed. The indictment was substantially in the language of the statute with sufficient particularization to inform the defendants of the nature of the charges against them and to enable them to prepare their defense. In short, the indictment spelled out an offense under 18 U.S.C.A. § 1343.

██ The motions for acquittal were also properly denied. Even if the evidence is excluded as to what Duran did and said, taking out the first five counts, it is not disputed that Huff called Salim from Juarez to El Paso on April 27, 1960 —the subject of the sixth count in the indictment and overt act No. 9 in the conspiracy count. And since the sentences for the first six counts for both defendants were to run concurrently, we need only find sufficient evidence to support the conviction for one of the counts to affirm the judgments. Perez v. United States, 5 Cir., 1961, 297 F.2d 12; Kahm v. United States, 5 Cir., 1962, 300 F.2d 78; Danziger v. United States, 9 Cir., 1947, 161 F.2d 299, cert. denied, 332 U.S. 769, 68 S.Ct. 81, 92 L.Ed. 354. So far as the jurisdictional call was concerned, Huff's consecutive sentence on the conspiracy count was substantiated by the very same call specified as one of the overt acts.

That such call was a step in the execution of the scheme was not disputed either. Salim testified that Huff said "Come over here, I have your son here,

8. "Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire * * * in interstate or foreign commerce, any * * * sounds for the purpose of executing such scheme or artifice, shall be fined not more than $1,000 or imprisoned not more than five years, or both." 18 U.S.C.A. § 1343.

come alone, I want to talk with you about him." No one undertook to dispute or deny this conversation. Indeed, Huff himself admitted to the American Consulate in Juarez that he called Salim about Nazry's being in jail.

As to Nicholson, counsel attempts to argue that there is no evidence to connect him with any conspiracy.[9] However, to convict of conspiracy, it is only necessary to prove knowledge of the conspiracy, and that some act in furtherance of it was intentionally done by the defendant charged. Duke v. United States, 5 Cir., 1956, 233 F.2d 897, 901. While mere presence is not sufficient to convict, the jury was entitled to find here, as it did, that it was more than mere coincidence or accident that Nicholson was present almost every time any part of the scheme took place. Indeed, from 1957 to 1960 whenever Nazry was involved with Huff, there was Nicholson also. Nicholson was with Huff when Nazry was first detained in 1957 and accused of burglarizing Huff's apartment. He was at the restaurant in Juarez when Huff called Salim. He was present when Salim arrived. His car—with him as the driver—was used to transport Huff and Salim from Juarez to Guadulape to see Nazry, and then to El Paso for Salim to get the money. He then drove Huff back to Juarez where he knew Huff expected to get the money from Salim. They were together there when they were arrested by the Mexican officials. It was for the jury to say whether Nicholson's presence and actions on each of these occasions were innocent coincidences, on the one hand, or culpable, active or willing, participation in a plan by which Huff was to get money out of Salim on the other hand. There can be no doubt about there being enough evidence of Nicholson's part in the conspiracy and the scheme to defraud to go to the jury.

In Specification of Error No. IV, see Note 1, it is asserted that the Court erred in overruling objection to evidence as to what Antonio Duran and the Mexican police officers did and said out of the presence of Huff and Nicholson. It must be pointed out that the evidence involving Duran was severely limited when it came in, and the charge instructed the jury not to consider it at all. It may be that this exclusionary charge went too far. For the evidence introduced was not hearsay. What Duran said to Nazry, and which Nazry then repeated to Huff, was not offered to prove the truth of such out of court declarations. It was to prove the words as an operative, verbal fact. Ward v. United States, 5 Cir., 1961, 296 F.2d 898; Safeway Stores, Inc. v. Combs, 5 Cir., 1960, 273 F.2d 295; United States v. Gavagan, 5 Cir., 1960, 280 F.2d 319. Since the required jurisdictional message can be found in Count six, and in overt act No. 9 as to the conspiracy count, without any of the above evidence, we see no need to, and therefore do not, reach the question as framed by the appellants. We do hold, however, that the action of receiving, then excluding, the evidence did not constitute an error on the ground that the evidence was of such a prejudicial nature as to require reversal.[10] Even with the testimony involving Duran excluded, there would still be evidence of Huff's trying to persuade Nazry to go to Mexico to look at some jewels. Without regard to whether the handling of it was proper or improper, we cannot hold here that receipt and exclusion of such cumulative evidence would require a reversal. Since the evidence was positively excluded by the Court in its charge, the only thing left is whether it was of such an inflammatory nature that the effect of it could not be eradicated. Certainly evidence of the calls from Duran was no more prejudicial than Huff's conversation with Nazry. Assuming, without deciding, the applicability of them, nothing in any of the cases cited by defendants would require a re-

---

9. This point is also raised in Specification of Error No. VII. See note 1, supra.

10. See 4 Barron & Holtzoff, Federal Practice & Procedure § 2578.

versal.[11] We likewise hold that the handling of the evidence concerning actions of the Mexican police officers does not require a reversal of this case. Similarly, we regard the objection to the testimony of Salim Abraham set out in Specification of Error No. IX as being without merit. As pointed out above, with respect to Duran's statements to Nazry, this testimony was not hearsay. It was not an effort to attribute out of court declarations of one not a conspirator as an admission against a defendant to prove the truth of the words spoken. It was testimony of words spoken as operative, verbal facts or actions done by others in the presence of the witness who testified of his own direct knowledge as to what he heard and saw, and as to which he was subject to cross examination. And, if the contention means more than an objection against hearsay so that it literally asserts that no evidence is admissable save that concerning events occurring in the presence of a defendant, it is obviously unfounded. Of course relevancy is required, but on that score there can be no real question. The scheme included coercive actions by Mexican policemen and the luring of Nazry and Salim in to Mexico. This testimony from witnesses having personal knowledge bore on those and other elements of the plan to get money from Salim.

As to the overruling of the motion for a Bill of Particulars complained of in Specification of Error No. II, we observe that F.R.Crim.P. rule 7(f), 18 U.S.C.A. makes the granting of such a motion discretionary with the Trial Judge. The issue before us, then, is not whether the Trial Judge should or should not have ordered the filing of a Bill of Particulars, but rather whether his action amounted to an abuse of discretion. On the record before us, we find no such abuse of discretion. The indictment, read in its entirety, offers sufficient particularity to enable the defendants to prepare for their defense and to protect them from a second prosecution for the same offense. While a large part of the appellants' argument is devoted to the proposition that they might have been surprised at the trial, no surprise was ever claimed by them at the trial. The overt acts specified considerable detail about times, places, telephone calls, persons and other actions. If the trial produced surprise, as distinguished from disappointment or damaging evidence, it was never revealed in the record.

Specification of Error No. VIII claims that the Government's questioning of a defense witness on cross examination was so highly prejudicial and improper that it constituted plain error since it implied that the witness was a narcotics addict.[12] We do not agree.

This line of questioning by the Government was apparently an attempt to impeach the defense witness. Its prejudicial effect is an afterthought. For none of the attorneys present in the courtroom representing the defendants thought this line of questioning at the time was so highly inflammatory or even improper enough to make an objection. There is no showing that the prosecutor, in propounding the question, knew that the wit-

11. United States v. Ganey, 2 Cir., 1951, 187 F.2d 541; Panci v. United States, 5 Cir., 1958, 256 F.2d 308; Mora v. United States, 5 Cir., 1951, 190 F.2d 749; Stanley v. United States, 6 Cir., 1957, 245 F.2d 427; Handford v. United States, 5 Cir., 1957, 249 F.2d 295.

12. The incident occurred as follows:
"Q. Now, Mr. Arredondo, isn't it true, or is it true, that in January, 1959, you were certified as a narcotics addict?
"A. Well, not exactly because I am not a narcotic, I am not an addict, and I can prove that, now.

"Q. Now, as of January, 1959, you were taken to the hospital in Juarez, Mexico, is that not correct?
"A. Not exactly to the hospital, but to the health department.
"Q. And in January of 1959 they certified you as an addict there, is that correct?
"A. No.
"Q. What did they do?
"A. I don't know exactly, but I have some papers here from Mr. Flores [a Mexican Judge] where it is stated that I am not an addict. * * *."

ness would make a denial. For that matter, the answer, equivocal as it was, in effect was at least an affirmation that there was a factual basis for asking the question.

 Specification of Error Nos. III, X and VII complain of the refusal by the Trial Judge of defendants' Special Requested Charges Nos. 1, 2, and 4. We find no error in the refusal of the requested charges. Requested Charge No. 1 in effect instructed the jury that if the defendants thought Nazry had stolen the jewelry in 1957, it would not be a violation of 18 U.S.C.A. § 1343 to attempt to recover the property. The law certainly does not countenance the sort of self-help described in the indictment and credited by the jury, especially when it was coupled with a plan to obtain, not the jewels of unknown value, but a huge sum of cash. Requested Charges Nos. 2 and 4, insofar as they correctly reflect the law, were adequately given by the Court in its careful and complete charge.

None of the asserted grounds is supported as to either appellant. All of the defendants' legal rights were protected. As is so frequent, it was for the jury to decide the truth. The truth was declared by the verdict. The verdict was guilty. There it ends.

Affirmed.

JONES, Circuit Judge (concurring in part and dissenting in part).

I join with the majority in affirming the conviction of the appellant Huff. As to sustaining the conviction of Nicholson, I dissent.

Although the majority pay lip serivce to the doctrine that mere presence is not sufficient to convict, it seems to me that they affirm the conviction on the statement that "whenever Nazry was involved with Huff, there was Nicholson also." The burden was on the United States to prove the guilt of Nicholson beyond a reasonable doubt. The only evidence to involve him in conspiracy is that he was

present. There is no evidence that he was a participant or that he even knew what Huff and the others were doing. I think we should reverse as to Nicholson and direct either an acquittal or a new trial.