Chris Marie BAIOCCHI, Appellant,

v.

UNITED STATES of America,
Appellee.

No. 20844.

United States Court of Appeals
Fifth Circuit.

June 4, 1964.

Rehearing Denied July 10, 1964.

* Of the Second Circuit, sitting by designation.

Lacy Mahon, Lacy Mahon, Jr., Jacksonville, Fla., for appellant.

Samuel S. Jacobson, Asst. U. S. Atty., Jacksonville, Fla., Edward F. Boardman,

U. S. Atty., Middle District of Florida, for appellee.

Before TUTTLE, Chief Judge, and JONES and BELL, Circuit Judges.

JONES, Circuit Judge.

Appellant appeals from her conviction of violations of 18 U.S.C.A. § 656[1] and 18 U.S.C.A. § 1005.[2] She was charged in a twenty-six count indictment with a series of defalcations while employed by The Florida National Bank of Jacksonville, Florida, and tried before a jury which returned a verdict of not guilty as to the first twelve counts and guilty as to the last fourteen. Counts one through twenty charged violations of 18 U.S.C.A. § 656, while counts twenty-one through twenty-six are based on 18 U.S.C.A. § 1005. She alleges three errors were committed by the trial court. First, she asserts that the court erred in not dismissing, upon appellant's timely motion, counts thirteen through twenty on the ground that "such counts of the indictment failed to allege facts sufficient to show that the bank suffered any monetary loss, or that any funds were withdrawn or converted from said bank by the appellant." The third contention of error is that the court should not have denied her motion for acquittal as to counts thirteen through twenty-six on the ground of insufficiency of the evidence to support them. The second of the assigned errors relates to remarks made by the Assistant United States Attorney in his argument to the jury.

The appellant was employed as a bookkeeper in the installment loan department of a member bank of the Federal Reserve Bank system with funds insured

1. "Whoever, being an * * * employee of * * * [a] member bank, national bank or insured bank * * * embezzles, abstracts, purloins or willfully misapplies any of the moneys, funds or credits of such bank or any moneys, funds, assets or securities intrusted to the custody or care of such bank, or to the custody or care of any such * * * employee * * * shall be fined not more than $5,000 or imprisoned not more than five years, or both; * * *."

2. "Whoever makes any false entry in any book, report, or statement of such bank with intent to injure or defraud such bank, or any other company * * * or to deceive any officer of such bank * * * or the Federal Deposit Insurance Corporation, or any agent or examiner appointed to examine the affairs of such bank * * *.

"Shall be fined not more than $5,000 or imprisoned not more than five years, or both."

by the Federal Deposit Insurance Corporation. This department was divided at that time into two sections; one of these was on the first floor where most of the business with the public was transacted, while the other, where the books were posted and the records were kept, was located on the ninth floor. The appellant worked in the section on the ninth floor.

It was shown by evidence adduced by the Government that payments made by borrowers of installments came directly to the ninth floor bookkeeping section. The remittances were taken from the mail and posted to customer's account in the loan ledger. At the same time the amount received and posted would be computed on the bookkeeper's board or recapitulation sheet. This board reflected the payments received and the credits to the appropriate accounts. The supervisor of the department likewise kept a board, which she testified covered the entire department. The figures from the bookkeeper's board, which apparently related only to payments, were transposed onto the supervisor's board.

The department also had access to the use of the bank's "Ourselves" checks. These were checks used to make intra-bank transfers of funds, and were obtained from the first floor of the bank by employees who needed them. An example of their proper use would be where an installment was prepaid. In order to hold the payment until the proper time for its application and at the same time let the customer's check clear, the employee would convert the customer's check into an "Ourselves" check and hold the latter until the payment was due.

Very little cash came into the bookkeeping section of this department, since most of the installment loans were paid by checks coming through the mails. The cash that came in was usually from the collection of bad checks, for which the customers would make payment in cash on the ninth floor.

In essence, the first twenty counts of the indictment charged that appellant had converted the cash that had come into the bookkeeping section and had covered the shortages with a scheme generally described as "lapping". Lapping, in its simplest terms, is a system where a shortage in one account is covered by a check presented in payment on another account which in turn is covered by a third check paying on still another account, and so forth. It is apparent that, in theory at least, with an increasing number of checks steadily coming in, a person with enough control of the department could drain off relatively small amounts and continue to cover them indefinitely.

The Government's proof was, to a considerable extent, circumstantial. It presented witnesses who testified that the payments mentioned in the indictment had in fact been made. It then produced evidence from which the jury might have inferred that the appellant opened virtually all of the mail and distributed it to the proper persons. There was evidence to the effect that she did the greatest part of the posting, that is, that she indicated on the borrower's individual ledger sheets that installments had been paid. Evidence was likewise produced that she enjoyed complete dominion over the bookkeeper's board. The Government showed that she used far more "Ourselves" checks than any one else in her section.

The Government's case admittedly revolved around the proceeds of three checks totaling slightly under $3,800 drawn by R-C Motor Lines in payment of three equal installments. There was evidence from which the jury might have come to the conclusion that these checks were not applied to the R-C Motor's ledger but rather were applied to other accounts, and that this was accomplished by the use of "Ourselves" checks. A remittance for a substantial amount could be used for making credits on one or more accounts where prior payments had been misapplied, and converted, in part, to "Ourselves" checks and held for future needs. The R-C Motor's payments were large enough to cover a number of pay-

ments on smaller accounts with the use of the "Ourselves" checks.

Finally, the Government produced an FBI accountant who presented evidence tending to show that checks and cash had come into the bookkeeping section on given days and that no payments had been credited to the appropriate account on those particular days; that amounts equal to those payments had been credited to the account at a later time, either with other checks or "Ourselves" checks; and that the cash which the Government had shown had come into the department had disappeared.

■■ Appellant's third contention is that there was insufficient evidence to support the conviction on counts thirteen through twenty-six, because the only loss that the evidence showed the Bank to have sustained was of the proceeds of the checks totaling slightly under $3,800 drawn by R-C Motor Lines. The jury acquitted the appellant on those counts which charged misapplication of those checks. Therefore, argues appellant, there being no evidence of any other actual loss by the bank, her motion for a judgment of acquittal should have been granted. As appellee points out, the last six counts of the indictment are unchallenged except for the assertion that there was insufficient evidence to support them. This claimed lack of evidence is based solely on the premise that there was no evidence of injury to the bank except in regard to the R-C Motor's account. Therefore, if we determine that proof of injury is unnecessary to sustain a conviction under 18 U.S.C.A. § 1005, the judgment should be affirmed in this respect. Evidence adduced in support of the prior counts would have been admissible in support of these last six. The sentence of three years imposed was a general one and within the maximum allowable under any of the last six counts, 18 U.S.C.A. § 1005. If we should decide that the last six counts have sufficient support in the evidence, then the appellant would not be prejudiced by the failure of the trial court to dismiss counts thirteen through twenty even if

such failure was erroneous. Hirabayashi v. United States, 320 U.S. 81, 63 S.Ct. 1375, 87 L.Ed. 1774; Rowe v. United States, 5th Cir.1963, 324 F.2d 27; Huff v. United States, 5th Cir.1962, 301 F.2d 760, cert. den. 371 U.S. 922, 83 S.Ct. 289, 9 L.Ed.2d 230.

In Harrison v. United States, 5th Cir. 1960, 279 F.2d 19, cert. den. 364 U.S. 864, 81 S.Ct. 105, 5 L.Ed.2d 86, this Court dealt with an indictment based on the first two paragraphs of 18 U.S.C.A. § 1005. There the trial court had instructed the jury that to find the defendant guilty it must find that he committed acts enumerated in those paragraphs with an intent to defraud. On appeal this Court held that the acts there enumerated were criminal per se and no such intent had to be shown. However, it made the following statement which we believe states the correct rule in regard to the third paragraph of that section where the intent to "injure or defraud" or "deceive" is prerequisite:

"We think it quite clear that there was ample evidence from which the jury could find the necessary intent to defraud the bank if that had been a necessary ingredient of the crime. It would be a fraud on the bank if the bank's funds were caused to be so manipulated as to bring appellant's account into apparent compliance with the rules of the bank when, in fact, if the truth were known, the transaction producing this effect was a total sham. It is not necessary that actual damage be shown in order to constitute fraud on the bank." 279 F.2d 19, 24.

This reasoning is supported by the rationale of those cases where it is held that restitution is no defense to a charge of misapplication, Kramer v. United States, 4th Cir.1951, 190 F.2d 712. Likewise, and more to the point, in United States v. Corbett, 215 U.S. 233, 244–245, 30 S.Ct. 81, 54 L.Ed. 173, it was held that an indictment, which charged that the defendant had made a false entry as to the condition of the bank in a report to the Comptroller of the Currency, was

**36**

not demurrable. The trial court had held to the contrary, reasoning that the entries could not have been made with an intent to injure and defraud the bank where "[t]he report could not possibly change the actual condition of the bank, and a false report showing a better condition than in fact existed might as readily be a benefit to the bank as a detriment." United States v. Corbett, D. Wis.1908, 162 F. 687, 688. The Supreme Court, in reversing, held that there was a question for the jury whether there was an intent to injure the bank:

"Because the false entries in the report showed the bank to be in a more favorable condition than it was in truth did not justify the conclusion that the entries in the report could, under no circumstances, have been made with intent to injure the bank, unless it be true to say that it must follow, as a matter of law, that to falsely state in an official report a bank to be in a better condition that it really is, under every and all circumstances is to benefit and not to injure the bank. But this view would do violence to the statute, which exacts truthful reports, upon the conception that the knowledge by the officials of the government of the true condition of the bank is conclusive to the safeguarding of its interests and its protection from injury and wrong." United States v. Corbett, 215 U.S. 233, 244–245, 30 S.Ct. 81, 85, 54 L.Ed. 173.

See also Caldwell v. United States, 10th Cir.1929, 36 F.2d 738, 742, cert. den. 281 U.S. 725, 50 S.Ct. 239, 74 L.Ed. 1143.

■ A study of the record convinces us that there was sufficient evidence to go to the jury of the making of false entries. Indeed, as we have said, the appellant raises no point to the contrary. Likewise, if the jury believed the evidence against appellant in regard to the physical acts committed, then we cannot say that they could not draw the inference of intent to injure or defraud the bank, or deceive the appropriate officials. United States v. Harter, 7th Cir.1940, 116 F.2d 51, 56.

■ In his closing argument to the jury appellant's attorney made the following remarks:

"the reason I use it [reasonable doubt] in this case is because I honestly believe in my heart that the Investigating Officer in this instance for the Government had and has a reasonable doubt in his mind as to who was guilty, Chris Baiocchi or Mr. Kirchoff [the head of appellant's department. I believe it. I say that for this reason:

"He stated today that, within one of these instances which he was investigating, he took the matter to the Government. He didn't decide not to prosecute Mr. Kirchoff but the Government did. But he took it there and he believed it. He believed that that was what occurred and they turned him down on Mr. Kirchoff. And I believe that then they had to turn somewhere else. And next in line—I don't say any of these ladies, that would be ridiculous. * * * But the next person that they turned to was Chris Baiocchi, and I believe it was the second choice. I believe there was a lot of question about it and let me tell you why I believe it and why I feel this way, and to base it on the evidence which I saw come from the stand."

On rebuttal the Assistant United States Attorney undertook to defend himself, the investigating officer in the case, the FBI and the Federal Government. He maintained that the various authorities in this case had not tailored the case to fit appellant. Finally, he made the following remarks:

"I have some doubt about the propriety of any lawyer standing before a jury and getting into what he sincerely believes in any way, shape or form. I just have some doubts about whether that's right. I've never done it before but Mr. Mahon

[appellant's attorney] said what he did and I'm going to say this to you: That I have been trying cases for a year now and, in the time that I've been trying cases, the cases that I've worked with I've never in my own mind been more certain, absolutely certain, after working as hard on a case, never been more certain or as certain of guilt as in this case."

Counsel for appellant immediately objected and moved for a mistrial. The court denied the motion but cautioned the jury that "what they [counsel] believe about it is immaterial. It's what the evidence shows and what you're convinced about it. You will be entirely justified in disregarding statements of belief by either one of them." After resuming argument the Assistant United States Attorney stated that "I guess maybe I owe all of you and the court and Mr. Mahon something of an apology for what I just said. * * * I went right ahead and did what I told you wasn't right and for that I apologize. Judge Simpson is going to instruct you that you are to disregard any statements about my beliefs and Mr. Mahon's beliefs. What he is going to tell you is proper."

Appellant urges as reversible error the trial court's denial of her motion for a mistrial on the ground that the remarks of the Assistant United States Attorney precluded her from receiving a fair trial. Appellee, on the other hand, contends that the remarks were not prejudicial and, even if they were, they were excusable on the ground that they were provoked.

The remarks of appellant's counsel were improper and immaterial. The comment of Government counsel contained an acknowledgment of impropriety as did their reiteration by way of apology. Cf. Hull v. United States, 5th Cir.1963, 324 F.2d 817. There is an unfortunately large number of precedents in this area to which we may look in reaching a decision as to whether the statements of Government counsel

were such as to require a determination that a mistrial should have been ordered because of prejudice to the appellant. The trial lasted about a week, much testimony was taken and many documents were introduced. The case against the appellant was dependent upon circumstances. This is not a case, such as Steele v. United States, 5th Cir.1955, 222 F.2d 628, Dugan Drug Stores, Inc. v. United States, 5th Cir.1964, 326 F.2d 835, or Berger v. United States, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314, where "misconduct was pronounced and persistent, with a probable cumulative effect upon the jury which cannot be disregarded as inconsequential." 295 U.S. 78, 89, 55 S.Ct. 629, 633. Nor are we faced with a situation like Dunn v. United States, 5th Cir.1962, 307 F.2d 883, where the jury was asked to take the word of an accomplice that the mayor of a town had taken kickbacks and told by the prosecutor in his opening statement that this was the most flagrant case he had ever tried and replete with fraud and, in closing, in effect that whenever a politician lets a contract he gets a kickback. The inflammatory nature of the remarks, the fact that the Government's case hinged on the credibility of the accomplice, and the mild admonition from the bench joined together to render the behavior prejudicial. Likewise the moonshine cases of Handford v. United States, 5th Cir.1957, 249 F.2d 295 and Traxler v. United States, 5th Cir.1961, 293 F.2d 327, where the prosecution in argument tried to link the defendants with death on the highways go to a different point.

Nor do we feel it incumbent upon us to face this problem as one where we must decide whether the Government produced "overwhelming" evidence of guilt or had a weak case. To say that an expression of belief requires reversal in a weak case, Berger v. United States, supra, Handford v. United States, supra, or does not require reversal in a strong case, United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129, is to say that prejudice must

be determined by taking the expression in context and considering it along with all the other circumstances of the case. Suffice it here to say that there was such evidence of guilt that the remark, taken in the context of Government counsel's conduct of the trial, and the other factors which we shall discuss, would not have loomed sufficiently large in the minds of the jurors to have constituted prejudice.

It has been held in the decided cases that, absent any other prejudicial features, the major fault with a prosecutor expressing his personal belief in the defendant's guilt is that he often implies or insinuates that he is basing such belief on matters outside the record. Where, on the other hand, expressions of personal belief are squarely placed on the record evidence before the jury, and this fact is made apparent to the jury, then such expressions are not necessarily *per se* prejudicial. Schmidt v. United States, 8th Cir. 1956, 237 F.2d 542; Henderson v. United States, 6th Cir. 1955, 218 F.2d 14, cert. den. 349 U.S. 920, 75 S.Ct. 660, 99 L.Ed. 1253. The situation perhaps closest to the case here is Thompson v. United States, 5th Cir. 1959, 272 F.2d 919, cert. den. 362 U.S. 940, 80 S.Ct. 805, 4 L.Ed.2d 769, where the prosecutor said, "I have put a lot of time in this case. I have worked hard on it, but even so I sincerely ask you to go out and render what you consider a proper verdict. I'll be frank with you, I think the verdict is guilty on all three counts." 272 F.2d 919, 920. n. 2. "In the light of" authorities discussed there, this Court held that the language of the prosecutor was not "error at all, much less prejudicial and, therefore, reversible error." 272 F.2d 919, 922. We conclude that under the circumstances of this case the jury would take the statements of the Assistant United States Attorney as based on the record produced before them.

Another element which tends to eliminate the possibility of prejudice to the defendant here is the fact that the remarks were provoked by those reproduced earlier in this opinion by the appellant's counsel. While this Court has said that "[a] prosecutor should be immune to improper tactics [of defense counsel]," Dugan Drug Stores, Inc. v. United States, supra 326 F.2d at 837, and feels that such an attitude is a sound rule of practice, nevertheless, provocation often does render innocuous remarks which might otherwise tend to be prejudicial. Lawn v. United States, 355 U.S. 339, 78 S.Ct. 311, 2 L.Ed.2d 321; Del Cristo v. United States, 5th Cir. 1964, 327 F.2d 208; Padron v. United States, 5th Cir. 1958, 254 F.2d 574, cert. den. 358 U.S. 815, 79 S.Ct. 22, 3 L.Ed.2d 57; Homan v. United States, 8th Cir. 1960, 279 F.2d 767, cert. den. 364 U.S. 866, 81 S.Ct. 110, 5 L.Ed.2d 88; Myres v. United States, 8th Cir. 1949, 174 F.2d 329, cert. den. 338 U.S. 849, 70 S.Ct. 91, 94 L.Ed. 520; Gridley v. United States, 6th Cir. 1930, 44 F.2d 716, cert. den. 283 U.S. 827, 51 S.Ct. 351, 75 L.Ed. 1441. We do not feel that it is necessary to elaborate on the provocative nature of the blast issued by the defense counsel here.

A third aspect of this episode which supports the appellee's position is the admonition given to the jury by the trial court at the time. It was calculated to, and we think did, sufficiently apprise the jury that their duty was to render a verdict based on the evidence and not on what either counsel told them he believed. Schmidt v. United States, supra; Homan v. United States, supra; Cf. Steele v. United States, supra; Traxler v. United States, supra.

Considering, therefore, all those factors discussed which go into the determination of whether appellant was prejudiced by the remarks of the prosecutor, we are constrained to hold that she was not.

The judgment is

Affirmed.