**UNITED STATES of America,**
**Appellee,**

v.

**James Neal BIGGERSTAFF, Appellant.**

**No. 11086.**

United States Court of Appeals
Fourth Circuit.

Argued April 3, 1967.

Decided Aug. 1, 1967.

Edmund I. Adams, Winston-Salem, N. C., and George E. Doughton, Jr., Durham, N. C., for appellant.

William H. Murdock, U. S. Atty., (H. Marshall Simpson, Asst. U. S. Atty., on the brief) for appellee.

Before SOBELOFF and BRYAN, Circuit Judges, and BUTZNER, District Judge.

SOBELOFF, Circuit Judge:

James Neal Biggerstaff appeals from his conviction by a jury for having know-

ingly made false entries on the books of a federally insured bank of which he was an officer, with intent to injure and defraud the bank, in violation of 18 U.S.C. § 1005.[1]

The evidence discloses that from July to December, 1963, Biggerstaff, the Assistant Vice-President in charge of installment loans of the Northwestern Bank of Burlington, North Carolina, was engaged in financing the purchase of a number of used cars sold by "AB&A" and its successor, Southern Automobile Sales of Burlington, businesses run primarily by Melvin Armstrong. Four similar transactions underlie the four counts of the indictment on which Biggerstaff stands convicted.[2]

The pattern followed in each instance was to cause the purchaser to sign a sheaf of papers, including an installment sales contract and, in addition, a blank, unsecured, personal note. Each purchaser testified that he was not aware that he was executing the additional, unsecured note, that he never received the proceeds from it, and that he thought the installment contract represented the entire purchase price of the automobile.[3] The blank notes in the four cases under examination were subsequently completed by Biggerstaff as to amount and due date, and it is the entry of these notes on the books of the bank that the jury found constituted the false entries charged.

While Armstrong at one point testified that he explained to each purchaser that the note represented a loan to cover a down payment on the car, at another point in the trial he admitted having told prospective purchasers that no down payment was required. Three of the four purchasers confirmed that one of the inducements which led them to Armstrong was his representation that no down payment would be required. Significantly, the amount of the notes was not deducted from the installment contract price, as a down payment would be ordinarily.

The proceeds of the notes were not precisely traced at trial, but Armstrong testified that he gave Biggerstaff a portion of the "profit" on all cars sold by him. It is a reasonable conclusion from Armstrong's testimony that he split the proceeds of the four unsecured notes with Biggerstaff. There was evidence that the bank issued checks payable to Southern Automobile Sales and to Melvin Armstrong in amounts up to and including the full discounted value of these notes, and that in each instance they were not entered on the books of the bank until several days after the entry of the installment contract notes.

The nature of the relationship between Armstrong and Biggerstaff was further elucidated by Armstrong. He testified that it was Biggerstaff who induced him to come to Burlington and enter the used car business, and that the business was

1. The statute provides in pertinent part that:

"Whoever, being an officer * * * of any * * * insured bank * * *.

*    *    *    *    *

[M]akes any false entry in any book, report, or statement of such bank with intent to injure or defraud such bank, or any other company, body politic or corporate, or any individual person, or to deceive any officer of such bank, or the Comptroller of the Currency, or the Federal Deposit Insurance Corporation, or any agent or examiner appointed to examine the affairs of such bank, or the Board of Governors of the Federal Reserve System—

Shall be fined not more than $5,000 or imprisoned not more than five years, or both."

2. The indictment originally contained eight counts, but three of them were dismissed at the close of the government's case. The jury returned convictions on the five remaining counts, but judgment of acquittal notwithstanding the verdict was entered on one count because of a technical variance between indictment and proof.

3. In accordance with customary practice, the installment contract was accompanied by notes for an equivalent amount, specifying the required periodic payments. In the ensuing text discussion, unless otherwise indicated, the reference will be to the blank, unsecured notes and not to the installment notes.

initially conducted under the "AB&A" label, the "B" representing Biggerstaff and the second "A" Armstrong's brother Wesley. The operation continued for several months and was then succeeded by Southern Sales, under Armstrong's sole proprietorship. Armstrong also testified that not only did the defendant finance his inventory and sales through the bank, but that he supplied Armstrong with vehicles repossessed by the bank, or which Biggerstaff obtained from other sources. A most revealing feature of their relationship is that in every case the automobile purchaser received at least 100% financing, that is, the bank was lending the purchaser the entire agreed price of the automobile. The unsecured so-called "down payment" notes were in addition to the 100% loans that financed the purchase—a measure of generosity truly without precedent in banking practice, as Armstrong himself testified.

By December, 1963, the bank's suspicions were aroused. On December 17, Biggerstaff, accompanied by several bank officers, went to a Burlington motel to discuss his activities in connection with the transactions between the bank and the used car lot. The upshot was the following statement signed by Biggerstaff:

"To whom it may concern: I, James N. Biggerstaff, do hereby make the following statement of my own free will and accord. I have received money from Melvin Armstrong, Wesley Armstrong, in the course of the automobile business. The amount of money I received is not actually known by me at this time * * *. I have not falsified any records of the bank, and the records are true as far as I know. * * *. I have accepted paper I realized was substandard. I have torn up credit reports, I don't know the number pertaining to loans, whether it would be approved or not. I have

concealed the condition of my department from the board of directors and also the home office. I have approved loans that were not properly secured or collateralized from Melvin and Wesley Armstrong. I have sold cars and accepted the profit on the automobile sales."

## I

We are of the opinion that there was sufficient evidence from which the jury could fairly and reasonably find Biggerstaff guilty of knowingly making the four false entries of which he stands convicted. His statement to the bank officers,[4] together with the evidence of his relationship with Melvin Armstrong, warranted the jury in finding, as it must have found, that Biggerstaff knew that the automobile purchasers were unaware that they were signing blank, personal notes in addition to the installment contracts and the 100% loans made on them.

Biggerstaff's first defense is that if he "faithfully recorded the transactions as they actually occurred," even if they were fraudulent, no violation of the statute is made out. While sound in the abstract, this proposition is wholly inapplicable to the facts of the case.

True, where an officer misapplies bank funds, as where he honors the checks of an insolvent, the entry of the transaction on the books as *an extension of credit* is not a false entry. Coffin v. United States, 156 U.S. 432, 15 S.Ct. 394, 39 L.Ed. 481 (1895); see also Cooper v. United States, 13 F.2d 16 (4th Cir. 1926) (note of financially irresponsible maker carried as *debt due*). However, we have here no genuine, though unauthorized, transaction; it is, as the jury found, a case of wholly sham transactions. Biggerstaff did not faithfully record actual transactions, but knowingly entered as assets on the books of the bank notes which the makers were not aware they were signing. The notes, the product of

4. Biggerstaff's self-serving remark that he did not falsify bank records is not conclusive in determining what constitutes a false entry, and the jury could consider the entire statement in light of the law as expounded in the District Court's charge.

slick sleight of hand, were not genuine in any sense. The proceeds of the notes were not paid to the makers or to anyone else for their account, and no attempt was made to enforce payment. Biggerstaff's intention was merely to create the illusion of transactions which in reality had no substance. What is a false entry is, at bottom, a factual issue to be determined by the jury on a view of all the relevant circumstances. See Meredith v. United States, 238 F.2d 535, 540–541 (4th Cir. 1956).[5]

## II

■ The next line of defense is that it was improper to receive the evidence of the makers that they did not know what they were signing, because a mere disclaimer of knowledge by a maker will not, under North Carolina law, avoid liability. Assuming the accuracy of this statement of the law, the testimony was not admitted in an effort to enforce the notes, but merely as a link in the chain of evidence to establish that the notes were sham and represented no actual loan, but were a cover up for the withdrawal of funds by the defendant. See Meredith v. United States, supra.

■■ Closely related to the question of the makers' knowledge is the defendant's complaint that the District Court erred in instructing the jury that it is not unlawful to fill in the blanks of a previously signed note if the completion is made strictly in accordance with the authority given by the maker. Requiring that a note shall be filled in strictly in accordance with the maker's instructions, the defendant argues, applies un-

der North Carolina law only to the immediate parties to the note; once negotiated to a holder in due course, even a fraudulently completed note may be enforced. Biggerstaff contends that the instruction should have been amplified to include the latter possibility. It would be a sufficient answer to this assignment of error that no request for amplification of the charge was made in the District Court. However, considering the point on its merits, we note that an instruction on the rights of a holder in due course would have been inappropriate because no claim was made, nor any evidence introduced, that the notes were in the possession of such a party. This was not a suit against the signers by a holder in due course. Indeed, the instruction was in the defendant's interest and could not have prejudiced him.

## III

■ It is also objected that the District Court interspersed in that portion of the charge relating to the accurate recording of an actual transaction references to "bona fide" and "good faith" loans. The contention is that this would tend to mislead the jury into believing that to absolve the defendant of criminal responsibility, the transactions had to be entirely free of any wrongdoing whatever. Read in light of the entire charge, however, we think that the challenged phrases could not possibly have been so interpreted. The District Court had earlier charged the jury, quite correctly, that "an entry upon the books of the bank of some alleged transaction which never occurred or of a transaction which

5. Biggerstaff's assertion that the evidence failed to prove that the bank was damaged, for there was no testimony that collection of the notes had been sought or that they were uncollectible, is misconceived. The relevant inquiry is whether Biggerstaff entered the notes on the books "with intent to injure or defraud" the bank. See Baiocchi v. United States, 333 F.2d 32 (5th Cir. 1964). If a note is entered on the books as an asset when in truth it represents no real transaction, to give the appearance of a credit which in fact was never extended to the maker, the jury may well find an intent to injure and defraud. Whether the bank ultimately suffered loss is immaterial.

It may be added that, apart from an intent to injure and defraud, an intent to deceive the officers of the bank or the examining officials also violates 18 U.S.C. § 1005. This indictment was not drawn, as it might have been, to cover also deception of officers and examiners; but under the facts proved this is immaterial, for the offense specifically charged and proved is within the condemnation of the statute.

did occur but was falsely recorded would be a false entry." In the challenged portion, the Judge was simply informing the jury of the converse, that if in verity a loan was made and accurately recorded, there was no false entry. The jury was told that if the books reflected a genuine event, they should acquit. There was no intimation that the loans had to be duly authorized as well as real.

### IV

Finally, the defendant maintains that in light of Garrity v. State of New Jersey, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967), his statement to bank officials, made at the motel, was inadmissible. *Garrity* is distinguishable. The question framed by the Court was "whether the Government, contrary to the requirement of the Fourteenth Amendment, can use the threat of discharge to secure incriminatory evidence against an employee." 385 U.S. at 499, 87 S.Ct. at 620. In contrast, Biggerstaff has not asserted, nor could he reasonably assert, that the conduct of the bank officers constituted government action or government coercion.

The judgment of the District Court is Affirmed.