UNITED STATES of America,
Appellee,

v.

Robert SCHWARTZ, Appellant.

No. 456, Docket 71–1871.

United States Court of Appeals,
Second Circuit.

Argued Feb. 2, 1972.

Decided July 17, 1972.

Paul B. Bergman, Asst. U. S. Atty., Brooklyn, N. Y. (Robert A. Morse, U. S. Atty., E.D.N.Y., David G. Trager, Asst. U. S. Atty., on brief), for appellee.

Arnold Davis, New York City, for appellant.

Before HAYS and OAKES, Circuit Judges, and CLARIE, District Judge.*

CLARIE, District Judge:

The appellant was convicted after a trial by the court of having conspired to violate § 8(c) of the Securities Exchange Act of 1934 (the "Act"), 15 U.S.C. § 78h(c),[1] and Rule 17 C.F.R. § 240.8c–1, which prohibit the unlawful hypothecation of securities by brokers or dealers, who transact a business through a national exchange. The trial court found that appellant had unlawfully caused Armstrong & Co., Inc., a broker-dealer, to hypothecate securities "carried for the account of" its customers, so that said securities were subjected to a lien in excess of the aggregate indebtedness of the customers on such securities. The appellant was sentenced to pay a fine of $2,500 pursuant to § 32(a) of the Act, 15 U.S.C. § 78ff, and 18 U.S.C. § 371. We affirm that conviction.

Armstrong & Co., Inc. (Armstrong) was organized in 1960 by Robert Edens and Bruce Armstrong,[2] and registered with the Securities and Exchange Commission (SEC) as a broker-dealer. Schwartz, an attorney, who had extensive experience in the securities field, acted as counsel for Armstrong which was the underwriter on several stock issuances. It was Schwartz's participation in the underwriting of a stock issuance for Triangle Instrument Co., Inc. (Triangle), that brought about this prosecu-

---

* United States District Judge for the District of Connecticut, sitting by designation.

1. 15 U.S.C. § 78h(c) provides in pertinent part:
 "It shall be unlawful for any member of a national securities exchange, or any broker or dealer who, transacts a business in securities through the medium of any such member, directly or indirectly—

 . . . . .

 "(c) In contravention of such rules and regulations as the Commission shall prescribe for the protection of investors to hypothecate or arrange for the hypothecation of any securities carried for the account of any customer under circumstances . . . (3) that will permit such securities to be hypothecated, or subjected to any lien or claim of the pledgee, for a sum in excess of the aggregate indebtedness of such customers in respect of such securities."

2. In 1961, Edens bought out Bruce Armstrong's interest in Armstrong.

tion. Appellant was more than simply the firm's legal counsel; he was intimately involved in its business activities, even extending credit by exchanging checks with the firm on occasion, so that it would have needed deposits upon which it could draw.

Armstrong signed an underwriter's agreement with Triangle in which a Regulation A stock offering became effective September 15, 1961. It provided for the sale of 150,000 shares of Triangle stock at $2 per share, with "an all or nothing" proviso that required all of said shares to be sold within a 45-day period. In the event that this were not accomplished, all funds received from the shares were to be returned to the prospective purchasers without interest, and there would be no further obligation between the underwriter and the company. However, if the shares were sold within the required period, Armstrong was to pay over $230,000 to Triangle, and $70,-000 was to be turned over to the underwriter to pay it a commission of 15% ($45,000) with the remaining $25,000 being used to cover expenses for accounting and legal fees.

The trial court found that at least 30,000 shares of stock were sold to individual customers of Armstrong and cash income in excess of $40,000 had been received for these shares. In addition, at least 70,650 shares were sold to brokers, who had not yet paid for them. At the end of the 45-day period, the Triangle issue had not been completely sold. When pressed by Triangle for a closing, Armstrong scheduled November 15, 1961, as the final date. Realizing that Armstrong did not have the $230,000 necessary to effect the closing, the appellant

suggested that a loan be obtained from Sterling Factors. Principally through the efforts of defendant Schwartz, an agreement between Armstrong and Sterling was concluded for a loan of $115,000 secured by a pledge of the entire 150,000 shares of the stock with endorsements in blank. This agreement provided for repayment over a 4-week period, and for the release of the shares at the rate of $2 each. It was understood that all shares would be released, when the entire note had been paid.[3]

Either prior to or at the closing, Armstrong paid over $40,000 directly to Triangle. This sum represented moneys which individual customers of Armstrong had paid for their purchase of Triangle stock. Schwartz was fully aware before the Sterling loan had been consummated, that Armstrong had sold a very substantial number of shares of this stock to customers other than broker-dealers, and that these stock customers had paid Armstrong in full.

Notwithstanding the Sterling loan, on November 15, the closing date, Armstrong was still short, approximately $30,000 of the total sum due Triangle. Only by means of a loan subsequently negotiated by an officer of Armstrong was the necessary money finally obtained and the closing effected the following day. The trial court concluded that Schwartz's action in pledging all the shares of Triangle stock to Sterling Factors exposed the customers of Armstrong, who had paid full value for their shares of Triangle stock, to the risk that they might not receive the same, if Armstrong defaulted. In such event, they would be required to rely upon the general credit of Armstrong for the return of their money.[4]

---

3. Although the agreement between Armstrong and Sterling did not so provide, at the closing appellant was asked to and did guarantee the payment of Armstrong's note to Sterling. Special Findings and General Findings, at 16 (April 26, 1971).

4. Although not relevant to the legal charge against appellant, Armstrong defaulted on the payments to Sterling. Sterling re-

leased only some 38,000 shares against payments received from Armstrong. Finally, an arrangement was effected whereby Armstrong returned 25,000 shares of unsold Triangle stock to Triangle, which then paid $35,000 to Sterling in order to get release of the remaining 112,000 shares so that they could be distributed to the purchasers who had paid for them. Findings, at 19.

*Appellant's Claims*

Appellant challenges his conviction on several grounds: (1) that he was denied his sixth amendment right to a speedy trial; (2) that the phrase "transacts a business" is so indefinite as to render 15 U.S.C. § 78h void for vagueness; (3) that the hypothecated securities were not "carried for the account of" Armstrong customers as required for a violation of 15 U.S.C. § 78h(c); (4) that the Government failed to establish the element of intent necessary for a conviction under § 32(a) of the Act, 15 U.S.C. § 78ff (a); (5) that the indictment should have been dismissed, because of the absence of sufficient evidence before the Grand Jury, and (6) that the trial court erred in receiving into evidence certain books and records of Armstrong.

## DISCUSSION OF ISSUES

### Denial of Speedy Trial

The appellant claims that his sixth amendment right to a speedy trial was violated both by the unreasonable length of time which elapsed between the commission of the offense and indictment, and by the inordinate delay between the indictment and trial. We first consider appellant's claim of unconstitutional pre-indictment delay.

The crime charged is alleged to have occurred between the dates October 10, 1961 and November 15, 1961, inclusive; however, the indictment was not handed down until November 14, 1966, one day prior to the running of the statute of limitations. 18 U.S.C. § 3282. In United States v. Marion, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971), the Court held that the sixth amendment is inapplicable to "pre-accusation delays."

It indicated that the statute of limitations is the primary safeguard against the bringing of stale criminal charges but explicitly left open the possibility that the demonstration of "actual prejudice" stemming from pre-accusation delay might require a dismissal under the Due Process Clause.[5] 404 U.S. at 324, 92 S.Ct. 455.

The appellant claims that he was actually prejudiced by this pre-indictment delay. He represents that during the SEC investigation into Armstrong's activities, he was assured that there were no claims of wrongdoing against him, and that he was permitted to represent Armstrong as counsel in that administrative proceeding. He explains that he was lulled into a sense of security by the overall circumstances and the inordinate delay, so that he destroyed 50 to 60 Armstrong files some 1 to 2 years after the completion of the SEC investigation. He would now ask the court to believe that the loss of these files impaired his ability to properly prepare his defense against these criminal charges.

A review of the record discloses that the appellant has failed to factually establish that he has suffered any significant prejudice as a result of any delay which led to the destruction of the Armstrong files. United States v. Scully, 415 F.2d 680, 683 (2d Cir. 1969); *see also*, United States v. Iannelli, 461 F.2d 483, 485 (2d Cir. 1972); United States v. Capaldo, 402 F.2d 821 (2d Cir. 1968), cert. denied, 394 U.S. 989, 89 S.Ct. 1476, 22 L.Ed.2d 764 (1969). There is no evidence to indicate that he was unable to credibly reconstruct the hypothecation transaction. United States v. Feinberg, 383 F.2d 60, 65 (2d Cir. 1967), cert. denied, 389 U.S. 1044, 88 S.Ct. 788,

5. The Court in *Marion* indicated that the Due Process Clause would require dismissal of the indictment "if it were shown at trial that the pre-indictment delay . . . caused substantial prejudice to appellees' rights to a fair trial and that the delay was an intentional device to gain tactical advantage over the accused." 404 U.S. at 324, 92 S.Ct. at 465 (footnote omitted). Although appellant in the instant case claims actual prejudice, he does not assert, and the record in no way indicates, that the Government delayed bringing the indictment in order to secure a "tactical advantage" over the accused.

The Court in *Marion* set forth no guidelines for making the "delicate judgment," 404 U.S. at 325, 92 S.Ct. 455, as to when actual prejudice alone warrants the dismissal of an indictment for pre-accusation delay.

19 L.Ed.2d 836 (1968). It would appear that under the circumstances, the appellant should have preserved the files for the benefit of his client, Armstrong, with whom he was so intimately associated.

The evidentiary record indicates that appellant has also failed to demonstrate, that any memory lapses attributable to the time delay between the offense and the trial made "suspect" the "reliability of the proceedings for the purpose of determining guilt." United States v. Feinberg, *supra*, 383 F.2d at 66. Thus, he has not demonstrated material pre-indictment prejudice sufficient to warrant dismissal under the Due Process Clause of the fifth amendment.

■ An alternative aspect of the appellant's claim of unreasonable delay refers to the post-indictment period. The trial did not commence until March, 1971, approximately 4½ years after the filing of the indictment.[6] The court has set out 4 factors, to consider when determining questions relating to a speedy trial; (1) length of the delay; (2) reason for the delay; (3) prejudice to the defendant; and (4) waiver by the defendant. United States ex rel. Solomon v. Mancusi, 412 F.2d 88, 90 (2d Cir. 1969), cert. denied, 396 U.S. 936, 90 S.Ct. 269, 24 L.Ed.2d 236 (1969), *followed in, e. g.*, United States v. Fitzpatrick, 437 F.2d 19, 26–27 (2d Cir. 1970), and United States v. Stein, 456 F.2d 844, 847–848 (2d Cir.), cert. denied, 408 U.S. 922, 92 S.Ct. 2489, 33 L.Ed.2d 333 (1972).

The Supreme Court has recently held in Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), that all of these factors should be weighed with each other and considered together with other relevant circumstances, recognizing that this places upon the courts a duty to "engage in a difficult and sensitive balancing process." *Id.* at 533, 92 S.Ct. at 2193.

The record does not disclose the reasons for the post-indictment delay. However, it is significant to note that the appellant and 8 other defendants were indicted on 18 counts. The first 17 counts involved all of the defendants, while the final count named only appellant and Edens, the president of Armstrong. Both the Government and the defendants focused their initial procedural efforts largely upon the first 17 counts. Count 18 was severed from the other counts of the indictment in June, 1967.

Appellant filed motions for multiple relief in February, 1968. He sought dismissal of the indictment on the ground that his fifth amendment rights were invaded, when the Assistant United States Attorney interviewed him seemingly as a cooperative witness, but without advising him that he was a prospective defendant. He also requested at that time a bill of particulars, and the right to inspect or an *in-camera* inspection by the court of the grand jury minutes. All of these matters were acted upon by the court. The case then lay dormant during 1969 and in February, 1970, the trial was scheduled on the first 17 counts for August, 1970. Changes of plea were subsequently entered by 7 of the defendants on the 17-count phase of the indictment, and none of those counts ultimately went to trial.

■ In June, 1970, the appellant first moved to dismiss count 18 for delay in prosecution and for factual insufficiency. The court denied both motions; the second in a lengthy opinion on October 2, 1970. The trial commenced in March, 1971. Just prior thereto, in January, 1971, co-defendant Edens entered a plea of nolo contendere on the 18th count.

While it could not be said that the Government promptly pressed the prosecution of count 18, we cannot attribute controlling significance to the Government's lack of vigilance for two reasons: (1) there has been no claim, nor does the record indicate, that any governmental delay here was a "purposeful or oppressive" violation of appellant's sixth

---

6. The Second Circuit Rules Regarding Prompt Disposition of Criminal Cases went into effect June 5, 1971, after the commencement of the trial in this case.

amendment rights. United States ex rel. Solomon v. Mancusi, *supra,* 412 F.2d at 91, quoting Pollard v. United States, 352 U.S. 354, 361–362, 77 S.Ct. 481, 1 L.Ed. 2d 393 (1957). *See also,* United States v. Stein, *supra,* 456 F.2d at 848; and (2) we are not persuaded that the petitioner's claims of prejudice have any merit.

In addition to the previously discussed issues relating to the claimed destruction of records and alleged impairment of memory, appellant's principal claims of prejudice center around the unavailability at trial of a former SEC official.[7] Appellant represents that he had solicited and received from him an informal expression of opinion approving the proposed transaction. He claims that had the SEC official been available at the trial, he would have confirmed the appellant's claim that he had acted in good faith.

■ The trial court found, however, that the evidence did not establish that the appellant had discussed this transaction with a representative of the New York office of the SEC and received from him an opinion shown to have been based upon a complete disclosure of the relevant facts. It also concluded that even if such an opinion had been expressed under informal circumstances, the defendant would not have been justified in relying upon it. That court expressly found "that the defendant Schwartz did not proceed in good faith reliance upon a belief derived from an interview with a responsible representative of the SEC, that the transaction with Sterling Factors was in conformity with and not violative of the hypothecation regulations."[8] Even were this court to find to the contrary, and conclude that such a showing would vitiate the mental state requisite for a violation of this statute, the appellant's claim of prejudice must fail, since he did not see fit to timely avail himself of the deposition procedures afforded under Rule 15, Fed.R.Civ.P., so as to make available at trial, the testimony which he now claims could have been relevant.

■■ The failure of a defendant to request a prompt trial may constitute a waiver of that right, even though waiver is only one relevant factor to be weighed with others in determining whether there has been a violation of sixth amendment rights.

"It has long been the rule of this Circuit that the failure to demand a speedy trial constitutes a waiver of that right, (citing United States v. Lustman, 258 F.2d 475, 478 (2d Cir. 1958), cert. denied, 358 U.S. 880, 79 S.Ct. 118, 3 L.Ed.2d 109 (1958); United States v. Smalls, 438 F.2d 711, 714 (2d Cir. 1971), cert. denied, 403 U.S. 933, 91 S.Ct. 2261, 29 L.Ed.2d 712 (1971)); *cf.* Dickey v. Florida, 398 U.S. 30, 36, 90 S.Ct. 1564, 26 L. Ed.2d 26 (1970). While Rule 8 of this court, concerning the prompt disposition of criminal cases, dispenses with the need for demand, waiver may still be considered as a relevant factor in deciding whether or not the constitutional right to a speedy trial has been violated." United States v. Singleton, 460 F.2d 1148, at 1151 (2d Cir. 1972), *See also* Barker v. Wingo, *supra.*

Here the appellant moved to dismiss the indictment for delay in prosecution on June 15, 1970. Considering that motion as a demand for a speedy trial, we conclude that the 9-month delay between that demand and the commencement of the trial in March, 1971, is not of sixth amendment proportions, when we consider that a substantial part of this 9-month period was taken up with the trial court's consideration of a motion by appellant to dismiss count 18 for factual insufficiency. *Cf.* United States ex rel. Schaedel v. Follette, 447 F.2d 1297, 1301 (2d Cir. 1971).

7. Well-advanced in years and seriously ill at the time of trial, the SEC official was unable to travel from his home in New Jersey to New York City to testify.

8. Findings, at 20–21.

Using the prescribed balancing test, Barker v. Wingo, *supra,* while the length of the delay was substantial here, as in United States v. Stein, *supra,* the case involved complex securities transactions and extensive pretrial motions and procedures; there has been no substantial showing of prejudice; there were no "purposeful or oppressive" delays on the part of the Government; and there was only a rather belated effort on the part of the defendant to bring the case to trial. We conclude that the defendant was not denied his sixth amendment rights.

### Vagueness

■ The appellant's next contention is that § 8(c) of the Act is void for vagueness. He challenges primarily the application to his case of the jurisdictional phrase, "any broker or dealer who *transacts a business* in securities through the medium of any such member (of a national securities exchange)." We conclude that the trial court's construction of this term was proper, and that the phrase is sufficiently clear to satisfy due process requirements.

Appellant points out that that phrase, "transacts a business," was previously construed in a 1939 Federal Reserve Board decision, so as to bring within the purview of Regulation T any broker-dealer who conducted approximately 10% of its total securities business through the medium of members of a national securities exchange.[9] He argues that any subsequent construction of this phrase should limit the reach of the statute to those broker-dealers showing at least this 10% minimal factor. Since Armstrong's gross business in this area amounted to only 1% or less of its total transactions, appellant contends that § 8(c) of the Act is not applicable to him.

The trial court found that although Armstrong dealt primarily with over-the-counter securities, it regularly handled customers' transactions in securities listed on the major stock exchanges and transacted a modest business in such securities through members of the national securities exchanges. Although the business was only 1% or less, it was nevertheless a valued and material part of its overall business activities.

■■ The trial court correctly concluded that Congress intended § 8(c) to apply to any broker or dealer, who transacted more than a trivial or *de minimis* business in securities through the medium of members of national securities exchanges. The very purpose of this Act was to provide remedial legislation, and it should be construed broadly, Tcherepnin v. Knight, 389 U.S. 332, 336, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967), in order to effect the congressional purpose of "insur(ing) the maintenance of fair and honest markets." 15 U.S.C. § 78b. *Cf.* United States v. Re, 336 F.2d 306, 316 (2d Cir. 1964), cert. denied, 379 U.S. 904, 85 S.Ct. 188, 13 L.Ed.2d 177 (1964).

For the appellant's vagueness claim to be persuasive, it would have to meet the standards which this Court recently set out for use in evaluating a claim of statutory vagueness:

"The applicable test is whether the language conveys 'sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices.' United States v. Petrillo, 332 U.S. 1, 8, 67 S.Ct. 1538, 91 L.Ed. 1877 (1947). *See* United States v. 16,179 Molso Italian .22 Caliber Winless Derringer Convertible Starter Guns, 443 F.2d 463, 466 (2 Cir. 1971), (cert. denied, 404 U.S. 983, 92 S.Ct. 447, 30 L.Ed.2d 367 (1971)). A statute violates due process if 'men of common intelligence must necessarily guess at its meaning and differ as to its application.' Connally v. General Construction Co., 269 U.S. 385,

9. 25 Fed.Res.Bul. 961 (1939). Regulation T, 12 C.F.R. §§ 220.1 et seq., promulgated by the Federal Reserve Board pursuant to § 7(c) of the Act, 15 U.S.C. § 78g(c), deals with credit extensions by brokers and dealers. The phrase, "who transacts a business in securities through the medium of any such member (of a national securities exchange)" was removed from § 7(c) in a 1968 amendment.

391, 46 S.Ct. 126, 70 L.Ed. 322 (1926). Even in criminal cases, however, where the vagueness standard is most stringently applied, the statute must only present 'ascertainable standard(s) of guilt.' Winters v. People of State of New York, 333 U.S. 507, 515, 68 S.Ct. 665, 92 L.Ed. 840 (1948). As the Supreme Court stated in *Petrillo*:

'That there may be marginal cases in which it is difficult to determine the side of the line on which a particular fact situation falls is no sufficient reason to hold the language too ambiguous to define a criminal offense. . . . The Constitution does not require impossible standards.' 332 U.S. at 7, 67 S.Ct. 1538." United States v. Deutsch, 451 F.2d 98, 113–114, (2d Cir. 1971), cert. denied 404 U.S. 1019, 92 S.Ct. 682, 30 L.Ed.2d 667 (1972).

The statutory phrase challenged here provides adequate notice to men of common intelligence as to its meaning and application. The term in question does not require that a substantial or principal part of the broker's business be conducted through members of the national securities exchanges, but only an ongoing regular portion thereof. The claim of statutory vagueness is therefore without merit.

### Hypothecation of Stock

Appellant next contends that the Government has failed to prove an unlawful hypothecation within the purview of 15 U.S.C. § 78h(c). He argues that the securities here were not "carried for the account of any customer" at the time of the pledge to Sterling Factors, and that therefore no hypothecation occurred.

Section 78h(c) and Rule 8c–1(c) proscribe the hypothecation of "securities carried for the account of any customer," when that hypothecation subjects those securities to any lien or claim of the pledgee for a sum in excess of the aggregate indebtedness of the customers in respect to such securities. Rule 8c–1 (b) (2) sets forth three separate definitions of the trade term, "securities carried for the account of any customer." [10] The trial court found that each of these definitions was satisfied. Since we find that the transaction at bar satisfies at least the first definition, we need not consider the others.

Said Rule 8c–1(b) (2) provides:

"The term 'securities carried for the account of any customer' shall be deemed to mean:

"(i) Securities received by or on behalf of such member, broker or dealer for the account of any customer."

The thrust of the appellant's claims on this issue, is that these securities were not carried for the account of any customer, because at the time Triangle stock was pledged to Sterling, some of the stock issue was still unsold and some had not yet been paid for. He argues that if the securities were being carried by Armstrong for its customers at the time of the hypothecation, then Arm-

---

10. Rule 8c–1(b) (2) provides:

"(2) The term 'securities carried for the account of any customer' shall be deemed to mean:

"(i) Securities received by or on behalf of such member, broker or dealer for the account of any customer;

"(ii) Securities sold and appropriated by such member, broker or dealer to a customer, except that if such securities were subject to a lien when appropriated to a customer they shall not be deemed to be 'securities carried for the account of any customer' pending their release from such lien as promptly as practicable;

"(iii) Securities sold, but not appropriated, by such member, broker or dealer to a customer who has made any payment therefor, to the extent that such member, broker or dealer owns and has received delivery of securities of like kind, except that if such securities were subject to a lien when such payments were made they shall not be deemed to be 'securities carried for the account of any customer' pending their release from such lien as promptly as practicable." 17 C.F.R. § 240.8c–1(b) (2).

strong was purchasing these securities not yet sold to and paid for by the public, for its own account subject to the lien of Sterling. Appellant contends that under Regulation A, 17 C.F.R. §§ 230, 251 et seq.,[11] Armstrong was barred from taking down stock in its own name, until the entire stock issue was fully sold and paid for, by the funds of the public subscribers. In appellant's view, Armstrong cannot be said to have carried Triangle securities for the account of its customers at the time of the hypothecation; otherwise, Armstrong would have been in violation of Regulation A. Such an argument is fallacious, for even if the transaction in question did violate Regulation A, appellant cannot negatively explain away and attempt to justify the hypothecation violation, by pointing also to a Regulation A violation. The hypothecation here subjected the customers, who had paid for their stock, to precisely the kind of risk from which the statute and rule were intended to protect them. These securities which had been sold and paid for were in fact carried for the accounts of customers at the time of the pledge, within the meaning of the statute and rule.

11. Regulation A, issued pursuant to 15 U.S.C. § 77c(b), exempts certain securities offerings from the registration requirements of the Securities Act of 1933.

12. Ruling on Motion to Dismiss the Indictment, at 10 (October 2, 1970).
Judge Dooling also pointed out that:
"Armstrong's possession and control of the 150,000 shares was momentary and essentially notional or 'constructive' receipt and possession of the stock incident to and implicit in the Meadowbrook (the transfer agent)–Triangle delivery at Armstrong's behest of the certificates and the 'stock powers' to Sterling in satisfaction of Armstrong's obligation to do so created by Sterling's delivery of the $115,000 to Meadowbrook-Triangle." *Id.* at 7.

13. The Senate Report on the Securities Exchange Act of 1934 pointed out that:
"Severe financial losses have been sustained by investors from time to time in cases where a broker pledged his customers' securities for loans in excess of the aggregate indebtedness due

■ Appellant also claims that Armstrong never "received" the shares, because Armstrong had transferred its interest in the Triangle shares to its pledgee, Sterling, on the day prior to issuance of the stock, when Armstrong delivered to Sterling stock powers signed in blank. The trial court concluded that "(i)f subsection (b) (2) (i) is in simplicity interpreted to include any security bought and paid for by a customer, that is so far 'received' by the broker that he is able to pledge it, then there is no problem in directly applying the statute" and rule to the hypothecation here.[12] Such a construction comports with the expressed Congressional intent to safeguard investors from irresponsible brokerage practices.[13] *Cf.* SEC v. Joiner Corp., 320 U.S. 344, 350–351, 64 S.Ct. 120, 88 L.Ed. 88 (1943).[14]

### *Willfulness*

Appellant's next contention is that his conviction cannot stand, because the Government's proof failed to establish *mens rea*—a specific criminal intent to violate the statute and regulation. The trial court found that although appellant knew of the existence and terms of

him in respect of such securities, or pledged them along with his own securities to finance his private speculative commitments." Sen.Rep.No.792, 73rd Cong., 2d Sess. (1934), at 11.
The House Report on the Act stated that, "A broker is forbidden . . . to pledge customers' securities . . . under circumstances that will subject customers' securities to a lien in excess of the aggregate indebtedness of the customers. This means that a broker cannot risk the securities of his customers to finance his own speculative operations." H.R.Rep.No.1383, 73rd Cong., 2d Sess. (1934), at 20.

14. " . . . courts will construe the details of an act in conformity with its dominating general purpose, will read text in the light of context and will interpret the text so far as the meaning of the words fairly permits so as to carry out in particular cases the generally expressed legislative policy." (footnote omitted) 320 U.S. at 350–351, 64 S.Ct. at 123.

the antihypothecation regulation, the Government failed to prove that the appellant believed or knew that the transaction with Sterling was a violation of the law and regulation.[15] Section 32(a) of the Act, 15 U.S.C. § 78ff(a), provides in part:

"Any person who willfully violates any provision of this chapter, or any rule or regulation thereunder the violation of which is made unlawful or the observance of which is required under the terms of this chapter . . . shall upon conviction be fined not more than $10,000 or imprisoned not more than two years, or both . . . but no person shall be subject to imprisonment under this section for the violation of any rule or regulation if he proves that he had no knowledge of such rule or regulation."

■ Appellant argues that the statutory requirement of willfulness necessitates proof not only of an intent to commit the act which constitutes the violation, but also a "specific intent to do that which the law forbids." United States v. Krosky, 418 F.2d 65, 67 (6th Cir. 1969). The final clause of § 32(a), however, makes it clear that the statute contemplates a "willful" violation by one who has no knowledge [16] of the violated rule or regulation. Since specific intent to violate the law presupposes knowledge of the law, it follows that such a specific intent is not necessary to sustain a conviction under § 32(a) for a violation of § 8(c) and the regulation adopted pursuant thereto.

The district court spelled out specifically what it found to be the appellant's state of mind, at the time he committed the offense and found him to be criminally culpable.

"Defendant's guilt is placed on his knowledge of the rule, his conscious and intentional participation in acts which constituted a violation of it, and his necessary perception that what was done subjected the customers who had paid for their stock to precisely the risk which the rule intended to protect them from having imposed upon them. That defendant may have believed or hoped that the regulation did not proscribe the precise kind of closing transaction set up with Sterling Factors, did not acquit him of guilt . . . . The transaction was nevertheless, as the *Atwater* case (People v. Atwater, 229 N.Y. 303, 128 N.E. 196 (1920)) suggests, in fact a violation of a regulation known to exist, and a reprehensible act within its own dimensions independently of the regulation." [17]

■ Proof of a specific intent to violate the law is not necessary to uphold a conviction under § 32(a) of the Act, provided that satisfactory proof is established that the defendant intended to commit the act prohibited. This conclusion is in harmony with the rationale in several decisions, which have considered the kind of intent necessary to sustain a criminal conviction or the imposition of a civil penalty for that class of violations designated as "public welfare offenses." Morissette v. United States, 342 U.S. 246, 255, 72 S.Ct. 240, 96 L.Ed. 288 (1952). *See* In the Matter of Cortlandt Investing Corp., Sec. Ex. Act Rel. 7682 (1965) at 5–6 (SEC upheld expulsion of a firm by the National Association of Securities Dealers in part for two violations of antihypothecation rule, 17 C.F.R. 240, 15c2–1, although it was found that the violations were inadvertent.

15. As already noted, however, the trial court specifically found that appellant did not act in good faith reliance upon a belief derived from an interview with a representative of the SEC that the hypothecation transaction was not violative of the statute and regulation.

16. "Proof of 'no knowledge' of the rule can only mean proof of an ignorance of the substance of the rule, proof that they did not know that their conduct was contrary to law." United States v. Lilley, 291 F. Supp. 989, 993 (S.D.Tex.1968).

17. Ruling on Motion for Judgment of Acquittal and for a New Trial, at 8 (May 14, 1971).

The Commission concluded that while the lack of an intention to violate the rule might have some bearing on the penalty, it was not relevant to the question of whether a violation had occurred. Under all the circumstances, however, the Commission modified the expulsion to a 30-day suspension. Noted at 5 Loss, Securities Regulation 3202–3203 (Supplement to Second Ed. (1969)); United States v. Sussman, 37 F.Supp. 294, 296 (E.D.Pa.1941); *cf.* United States v. International Minerals & Chemical Corp., 402 U.S. 558, 91 S.Ct. 1697, 29 L.Ed.2d 178 (1971); United States v. Freed, 401 U.S. 601, 607–610, 91 S.Ct. 1112, 28 L.Ed.2d 356 (1971); Morissette v. United States, *supra,* 342 U.S. at 252–262, 72 S.Ct. 240, 96 L.Ed. 288; United States v. Dotterweich, 320 U.S. 277, 280–281, 64 S.Ct. 134, 88 L.Ed. 48 (1943); United States v. Ruisi, 460 F.2d 153, at 156 (2d Cir. 1972); Tager v. Securities and Exchange Commission, 344 F.2d 5, 8 (2d Cir. 1965); United States v. Custer Channel Wing Corp., 376 F.2d 675, 680–682 (4th Cir. 1967), cert. denied, 389 U.S. 850, 88 S.Ct. 38, 19 L.Ed.2d 119 (1967); Hughes v. Securities and Exchange Commission, 85 U.S.App.D.C. 56, 174 F.2d 969, 976–977 (1949). *See generally* 2 Loss, Securities Regulation 1307–1312 (Second Ed.1961), supplemented by 5 Loss, Securities Regulation 3366–3374 (1969); 3 Loss, Securities Regulation 1984–1987 (Second Ed.1961), supplemented by 6 Loss, Securities Regulation 4123–4127 (1969) (After reviewing the cases, Professor Loss concluded that "it seems reasonably well settled that 'willfully' in the SEC statutes does not have any 'bad purpose' connotation (beyond whatever bad faith concept is inherent in the fraud provisions as distinct from the registration provisions and the like).") *But see,* Herlands, Criminal Law Aspects of the Securities Exchange Act of 1934, 21 Va.L.Rev. 139, 142–150 (1935). *But cf.* United States v. Murdock, 290 U.S. 389, 394, 54 S.Ct. 223, 78 L.Ed. 381 (1933); United States v. Van de Carr, 343 F.Supp. 993 (C.D. Cal.1972).

 Because appellant was not charged with a substantive violation of the antihypothecation statute, but rather with conspiracy, under 18 U.S.C. § 371, to cause Armstrong to violate that statute, it is necessary to consider whether this conspiracy charge raises the level of requisite criminal intent beyond that we have held necessary to sustain a substantive conviction under § 78h(c) and § 78ff of the Act. United States v. Freed, *supra,* 401 U.S. at 609 n. 14, 91 S.Ct. 1112, 28 L.Ed.2d 356. In Ingram v. United States, 360 U.S. 672, 678, 79 S.Ct. 1314, 1319, 3 L.Ed.2d 1503 (1959), the Supreme Court held that,

"(C)onspiracy to commit a particular substantive offense cannot exist without *at least* the degree of criminal intent necessary for the substantive offense itself." (footnote omitted) (emphasis in original).

The cases applying this principle largely deal with the situation in which a defendant was convicted of conspiracy on a showing of criminal intent less than that necessary to sustain a violation of the substantive offense. *See, e. g.,* United States v. Hysohion, 448 F.2d 343, 347 (2d Cir. 1971); United States v. Gallishaw, 428 F.2d 760, 763 (2d Cir. 1970); United States v. Bufalino, 285 F.2d 408, 415–416 (2d Cir. 1960); United States v. Ausmeier, 152 F.2d 349, 356 (2d Cir. 1945). We conclude that, under the facts of this case, a conspiracy conviction will be sustained upon the same showing of criminal intent necessary to make out a violation of the substantive offense. *Cf.* United States v. Mack, 112 F.2d 290, 292 (2d Cir. 1940). The evidence clearly indicates that appellant and Edens agreed to and did perform those acts which legally constituted a violation of the antihypothecation statute and regulation.

### *Sufficiency of the Indictment*

 We next deal with the appellant's claim that his conviction violates the fifth amendment because the evidence presented to the grand jury was insufficient to justify his indictment.

The trial court denied appellant's motion to dismiss the indictment, and held that

"The precise language of Mr. Justice Black in Costello v. United States, 350 U.S. 359 at 363, 76 S.Ct. 406, at 408, 100 L.Ed. 397, makes the bare vote of the Grand Jury enough. Here there was that and nothing more. There was no evidence 'sufficient' by any standard to support the charge. Nevertheless, the motion must be denied."

Appellant contends that the several decisions of this Circuit which somewhat *modify Costello* with respect to indictments based largely and unjustifiably upon hearsay, *see, e. g.,* United States v. Arcuri, 405 F.2d 691 (2d Cir. 1968), cert. denied, 395 U.S. 913, 89 S.Ct. 1760, 23 L.Ed.2d 227 (1969), require reversal here. There is no merit to this contention. This court has held that

"A defendant has no right to have an indictment dismissed merely because incompetent or inadequate evidence was presented to the Grand Jury. Lawn v. United States, 355 U.S. 339, 78 S.Ct. 311, 2 L.Ed.2d 321 (1958); Costello v. United States, 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956). But *a motion to dismiss or quash an indictment because of the absence or incompetency of evidence before the Grand Jury is addressed to the discretion of the trial court, and the decision to grant or deny the motion will not be reversed unless there has been an abuse of that discretion.* (citations omitted) As long as there is some competent evidence to sustain the charge issued by the Grand Jury, an indictment should not be dismissed. Coppedge v. United States, 114 U.S. App.D.C. 79, 311 F.2d 128, 132 (1962), (cert. denied, 373 U.S. 946, 83 S.Ct.

1541, 10 L.Ed.2d 701 (1963))." United States v. Tane, 329 F.2d 848, 853–854 (2d Cir. 1964).

*See also,* United States v. Ramsey, 315 F.2d 199 (2d Cir. 1963) *(per curiam),* cert. denied 375 U.S. 883, 84 S.Ct. 153, 11 L.Ed.2d 113 (1963). We conclude that there was "some competent evidence" to support this indictment and that the trial judge did not abuse his discretion in declining to dismiss it.[18] Appellant does not claim that the Grand Jury was biased or prejudiced against him. The "integrity of the judicial process" is not seriously threatened by this indictment. United States v. Leibowitz, 420 F.2d 39, 42 (2d Cir. 1969).

### Business Records

■ We finally consider appellant's argument that the trial court erred in admitting the blotters and ledgers of Armstrong into evidence pursuant to the Federal Business Records Act, 28 U.S.C. § 1732. The trial court found that these records had been impeached for accuracy and completeness, but that they had been made in the regular course of Armstrong's business, and that it was the regular course of the business of Armstrong to keep such records. We find no error. *See* United States v. Re, 336 F.2d 306, 311–314 (2d Cir. 1964), cert. denied, 379 U.S. 904, 85 S.Ct. 188, 13 L.Ed.2d 177 (1964). Further, appellant has not pointed to any specific instance where the district court relied upon an unclear entry to his prejudice. *Cf.* United States v. Schabert, 362 F.2d 369, 371–372 (2d Cir. 1966), cert. denied, 385 U.S. 919, 87 S.Ct. 230, 17 L.Ed.2d 143 (1966).

We have considered appellant's other contentions and find them without merit. The judgment of conviction is affirmed.

---

18. The trial judge noted that since appellant delayed until 1970 in making the motion to dismiss the indictment because of the insufficiency of the evidence presented to the Grand Jury, discretion called for denial of the motion. Ruling on Motion to Reconsider, at 5. (August 12, 1970) (Dooling, J.).

The evidence presented to the Grand Jury included the hypothecation agreement between Armstrong and Sterling; testimony as to appellant's guaranteeing Armstrong's note to Sterling; and the 1962 SEC Report on Armstrong, which in part sketched the hypothecation transaction between Armstrong and Sterling. SEC Report, at 52–62.