**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Harold ERICKSON and Francis Wilson,
Defendant-Appellants.**

**Nos. 78–1511, 78–1512.**

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 5, 1979.

Decided June 22, 1979.

As Amended on Denial of Rehearing and
Rehearing En Banc Aug. 3, 1979.

---

Randall J. Sandfort, Victor C. Harding, Milwaukee, Wis., for defendant-appellants.

Joan F. Kessler, U. S. Atty., Thomas E. Martin, Asst. U. S. Atty., Milwaukee, Wis., for plaintiff-appellee.

Before TONE and WOOD, Circuit Judges, and EAST, Senior District Judge.*

TONE, Circuit Judge.

Defendants were convicted of causing false entries to be made in the records of the bank of which they were officers and of causing false and misleading financial statements to be filed by an affiliated bank holding company, in violation of the False Banking Entry Act and the Securities Exchange Act of 1934, and of conspiring to do the same. More specifically, they were found to have failed to disclose the effect on the bank's income account of certain "overtrades," i. e., security transactions executed at prices in excess of the prevailing market prices. In this opinion, we consider only the sufficiency of the indictment and the evidence, leaving alleged trial errors to be dealt with in a contemporaneously filed unpublished order. We affirm the convictions on the conspiracy and securities law counts but reverse on the banking entry counts.

Erickson was chairman of the board of directors of both American Bankshares Corporation (Bankshares), a holding company, and one of its subsidiaries, American City Bank and Trust Company (the bank); he was also president of Bankshares. Wilson was one of the bank's vice presidents and head of its Investment Department. Securities in the Investment Department were held in either a trading account or a portfolio account.

In early 1973 the bank, under Wilson's direction, executed a series of federal security short sales with the expectation that the market would continue to fall. When this expectation was not realized, the short sales had to be covered. Instead of borrowing the securities needed for that purpose from a third party, Wilson caused the bank to borrow them from its own portfolio and later purchase identical securities to replace them. Wilson later caused the bank to sell these "replacement securities" in the series of year-end overtrades described more fully below.

In either July or August 1973, Ernst & Ernst, who until 1974 was Bankshares' independent auditor, gave Erickson and Wilson the apparently mistaken advice that because the "short sales" had been covered with the bank's own securities, they were completed transactions; consequently the bank, and therefore Bankshares, would have to recognize any losses incurred on those transactions.[1] This loss would have approximated $800,000, a substantial amount in light of the bank's profit of only about $1,000,000 the previous year. Wilson objected, stating that "what he had done was common practice in the industry, and that he would obtain letters from other banks to support his position." [Government Exhibit (G.Ex.) 44, p. 2.] Ernst &

---

* The Honorable William G. East, Senior District Judge of the United States District Court for the District of Oregon, is sitting by designation.

1. Later, after the transactions on which the indictment is based, Ernst & Ernst's successor, Arthur Andersen & Co., disagreed, reasoning that since the portfolio securities were replaced by identical securities, the latter could be carried at the "cost" of the original securities.

Under this view, the portfolio account would not have been required to recognize any loss on the transaction; but Erickson and Wilson relied on Ernst & Ernst's contrary view at the time in question. [Tr. 1194–1198; 1259.] The anticipated loss on the short sales is relevant only because it provided the motive for what followed.

Ernst expressed its willingness to reconsider its position if Wilson could provide such letters. After trying unsuccessfully to obtain the letters, Wilson told Erickson that some of the "replacement securities" had already been sold and most of the rest could be sold above the current market price to avoid the substantial loss threatened by the position taken by Ernst & Ernst. [*Ibid.*]

With Erickson's approval, Wilson then engaged in a series of negotiated overtrades, whereby the bank sold most of the remaining "replacement securities" not at market prices but at inflated prices. The *quid pro quo* for each of these sales was a concurrent agreement by the bank to buy from the purchaser of the "replacement securities" other securities of approximately equal value at approximately equally inflated prices. The manner in which these transactions were recorded, which avoided recognition of loss,[2] forms the basis of the indictment.

The bank recorded these transactions as if the purchases were unrelated to the sales and each side of the transaction had been an independent arms length sale and purchase. The premium received by the bank on the sale of securities was included in the sale price recorded, without reference to the agreement to pay a similar premium on the reciprocal purchase of other securities or the market value of the securities purchased. Similarly, the cost of the securities purchased by the bank was recorded at the inflated purchase price instead of their market value. Although even the inflated selling price was usually a little less than the carrying value of the securities sold, resulting in a recorded loss to the bank, that recorded loss was much less than it would have been if the price recorded had been the market value of either the securities sold or the securities purchased by the bank.

David Drought, the Ernst & Ernst audit supervisor assigned to the Bankshares' examination for the year ending December 31, 1973, was understandably curious as to why anyone would pay more for securities than the prevailing market price. In a memorandum summarizing a February 26, 1974 meeting with other Ernst & Ernst personnel he explained:

The Money Center [the bank's Investment Department] had accomplished its goal of disposing of the issues without substantial losses but the question remained as to how other brokers could buy the securities at such inflated prices without hurting themselves.

[The bank's] purchases of new and different issues prior to year-end and, in some cases, the identical issues after year-end from the same brokers, also at inflated prices provided the answer. This was the matter of concern in that the Bank appeared to have sold the securities without loss by manipulating prices and later replacing the securities or equivalents so as to put themselves back in the beginning position with substantial unrecorded depreciation on the issues.

[G.Ex. 40, p. 2.][3] Wilson's explanation was that the bank was able to dispose of the replacement securities at prices above the market price because, for these particular securities, there was a "seller's market" and the market prices reflected only a "thin and insufficient market." [G.Ex. 11, p. 2.] Erickson later made similar representations to a partner at Arthur Andersen & Co. [G.Ex. 44, p. 2.], the accounting firm that succeeded Ernst & Ernst as Bankshares' independent auditor.

Ernst & Ernst certified Bankshares' consolidated financial statements for 1973 without requiring any adjustments or explanation concerning these transactions, ap-

2. Wilson and Erickson apparently executed the overtrades on the premise that if the "replacement securities" could be disposed of by year-end and other securities substituted, using inflated prices for both sales and purchases, the loss threatened by Ernst & Ernst's position on accounting for the short sales could be avoided. [*See* G.Ex. 40, p. 1.] Sale of the "replacement securities" at prices above market would avoid the anticipated recognition of unrecorded de-

preciation. Purchase of other securities at prices above market would establish an inflated cost basis for the new securities.

3. The purchases of identical securities after year-end referred to in Drought's memorandum are to be distinguished from the purchases of "new and different issues." Only the latter are involved in this case.

parently taking the position that the transactions were "in substance" repurchase agreements, and therefore no gain or loss need be recognized.[4] Arthur Andersen, disagreed, however, reasoning that since the bank had purchased securities different from those sold, the transactions could not be treated as repurchase agreements. Further, since the transactions were closed, the full loss resulting from the sale of the "replacement securities" had to be recognized. Recognition of the loss was accomplished by writing down the carrying value of the security acquired in each overtrade to its market value on the day of the acquisition and making a corresponding adjustment in the income account reducing income, or increasing loss, in the amount of the write-down.

Counts 3 through 8 of the indictment charge both defendants with violating the False Banking Entry Act, 18 U.S.C. § 1005,[5] by causing entries relating to the purchases to be made in the bank's records that were "inflated and false in light of the true market value" of the securities when purchased, with the intent to deceive officers of the bank and others.

Count 2 charges each defendant with wilfully and knowingly making and causing to be made false and misleading statements of material fact in Form 10–K filed with the Securities and Exchange Commission for the year ending December 31, 1973, in violation of §§ 13 and 32 of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78m(a), 78ff.[6] Specifically, Erickson and Wilson were alleged to have understated Bankshares' losses for the year ending December 31, 1973 by $423,946, about 16 per cent. The government's theory under Count 2 was that as a result of the overtrades the bank avoided recording the even greater losses that were in fact incurred.

Count 1 of the indictment charged each defendant with conspiring to commit the offenses charged in Counts 2 through 8, in violation of 18 U.S.C. § 371.

## I.

### *Sufficiency of the Indictment: Counts 1 and 2*

■ Defendants challenge the indictment on the ground that it fails to allege a crime.

---

**4.** According to the testimony at trial, a "repurchase agreement" appears to be in substance a secured loan. It involves little more than a "sale" of securities and an obligation to repay the "sale price" plus interest on the sale price at some later date. As with any loan, the borrower would not include the amount of money borrowed as income and the collateral would not be treated as having been sold.

The Comptroller of the Currency requires banks to state separately the value of all securities sold pursuant to repurchase and similar agreements on financial statements filed with the SEC. *See, e.g.,* 12 C.F.R. § 11.71: Balance Sheet Instructions 5 (assets), 16 (liabilities); Income Statement Instructions 1(c) (income), 6(e) (expenses); 12 C.F.R. § 206.71; Balance Sheet Instructions 4 (assets), 14 (liabilities); Income Statement Instructions 1(c) (income), 2(e) (expenses); *see also* 17 C.F.R. §§ 210.9–01(c), 210.9–05(a) (SEC regulations concerning bank and bank holding company financial statements). The transactions in question here were not reported as repurchase agreements in Bankshares' 10–K for 1973, on which Count 2 is based, but as unrelated purchases and sales.

**5.** In relevant part the statute provides that

Whoever makes any false entry in any book, report, or statement of such bank with intent to injure or defraud such bank, or any other company, body politic or corporate, or any individual person, or to deceive any officer of such bank, or the Comptroller of the Currency, or the Federal Deposit Insurance Corporation, or any agent or examiner appointed to examine the affairs of such bank, or the Board of Governors of the Federal Reserve System Shall be fined . . . or imprisoned . . . or both.

**6.** Section 13 of the Exchange Act, 15 U.S.C. § 78m(a), requires every issuer of a security registered under § 12 of the Act, 15 U.S.C. § 78l, to file certain reports, including an annual report, with the SEC. Bankshares is such an issuer.

Section 32, 15 U.S.C. § 78ff, provides in relevant part that

[A]ny person who willfully and knowingly makes, or causes to be made, any statement in any . . ., report, . . . required to be filed under this chapter or any rule or regulation thereunder . . ., which statement was false or misleading with respect to any material fact, shall upon conviction be fined not more than $10,000, or imprisoned not more than five years, or both, . . . .

The gist of this argument seems to be that by alleging that the defendants made purchases of certain bonds at prices above their market value with the intent to conceal the bank's loss, i.e., for the purpose of affecting income, the indictment alleges "a non sequitur"; for, defendants argue, the purchase of bonds in excess of their market price could not affect the bank's income, and "the requisite element of intent is lacking in the indictment." As a further consequence, say the defendants, the indictment did not apprise them specifically "as to what burden they must be prepared to meet at trial."

The conspiracy alleged in Count 1 is described in paragraph 12, which states as follows:

It was a part of the conspiracy and agreed upon that HAROLD L. ERICKSON and FRANCIS M. WILSON would cause the American City Bank and Trust Company to engage in a series of deceptive securities transactions, to-wit, the American City Bank and Trust Company would sell securities to another party at prices in excess of market price, and, by prior arrangement, the American City Bank and Trust Company would purchase other securities from the same party at prices similarly in excess of market price; the false and inflated value of said purchased securities would be recorded and reflected on the books, records and statements of said bank, all for the purpose of avoiding full recognition of losses to the American City Bank and Trust Company on said books and records of said bank.

Count 1 goes on to allege a series of overt acts, which consist of purchases of described debt securities at prices that were "inflated and false in light of a true market value" that on the date of purchase was lower than the purchase price. In the case of each purchase, the purchase price and the "true market value" are specifically alleged, and it is further alleged that "the net effect of said transaction was to conceal an increase in the loss to said bank in 1973 in the amount of approximately" a specified amount.

The net effect of each of the overtrade transactions described in paragraph 12, in which the sale and purchase were reciprocal, was realization of a loss on the security sold. The alleged conspiracy was to engage in the transactions and to record the false and inflated value of the purchased securities in the records of the bank "for the purpose of avoiding full recognition of losses to the [bank] on [the] books and records of said bank."

Defendants' argument is that the recording of the purchase side of the transaction could not affect income or cause the recognition of losses to be avoided. Paragraph 12, however, although it does not mention the recording of the sale side of the transaction, describes the entire transaction, and sufficiently conveys the gist of the charge, which was overstating income. As the evidence later showed, the recording of the purchased securities at an inflated value was one aspect of the misleading statement, the other being the overstatement of income. When the statement was ultimately corrected, a write-down of the purchased securities to their actual value at the time of acquisition also required an entry adjusting the income account by a like amount. The indictment was not required to state all the intricacies of the bookkeeping and accounting entries that would result in a false and misleading statement. It was enough that the defendants conspired to make such a statement for the purpose of avoiding recognition of losses the bank had realized.

Likewise, it was not fatal to Count 1 that each of the overt acts alleged was the purchase side of the overtrade. It would have been sufficient to allege a single overt act, and of course the overt act need not itself have been illegal.

Defendants' attack on Count 2 of the indictment is similarly without merit. The respect in which that count alleges that the Form 10–K was false and misleading was in reporting an "income loss" of $2,523,645, and omitting to include in the loss "an unrecorded loss on securities in the approximate amount of $423,946, said securities

having been purchased by American City Bank and Trust Company in 1973 at prices in excess of market value." Again, we cannot say that an adjustment of the loss figure would not have resulted from adjusting the purchase price of the securities to reflect their market value at the time of purchase. In fact, as the evidence showed, the proper accounting procedure required such an adjustment to reflect the lower value of the securities purchased, which in turn required a corresponding entry in the income account reducing income and thus reflecting the loss incurred in the overtrade transactions.

Counts 1 and 2 are sufficient for the foregoing reasons. We need not consider the sufficiency of Counts 3 through 8, for we have concluded that the convictions under those counts cannot stand for another reason, to which we now turn.

## II.

### *Sufficiency of the Evidence under Counts 3 through 8: Falsity*

Each of Counts 3 through 8 charges the defendants with having made and caused to be made, with respect to a specified overtrade transaction, false entries on the

bank's "order form" that were reflected in the bank's records, reports, and statements, with the intent to deceive officers of the bank and others. It is not alleged that the bank paid less than the amount recorded. Rather, the purchase price is alleged to have been "inflated and false in the light of the true market value" on the date of purchase.

The bank records introduced in evidence in support of these counts were (1) order forms, (2) confirmation advices from the sellers, (3) debit and credit forms, and (4) pages from the general ledgers to which data from the debit and credit forms were transferred. None of these documents purports to show the market value of the purchased securities or the substance of the transactions. They purport merely to show the price at which the security transaction was executed.

■ Although entries recording fictitious transactions or inaccurately recording actual transactions are false within the meaning of 18 U.S.C. § 1005,[7] an entry recording an actual transaction on a bank's books exactly as it occurred is not a false entry under that statute even though it is a part of a fraudulent or otherwise illegal scheme.[8] The en-

7. *See, e.g., United States v. Giles*, 300 U.S. 41, 57 S.Ct. 46, 81 L.Ed. 390 (1937) (omission of deposit slips resulting in inaccurate balances); *United States v. Darby*, 289 U.S. 224, 226, 53 S.Ct. 573, 77 L.Ed. 1137 (1933) (forged signature on promissory note); *Agnew v. United States*, 165 U.S. 36, 52–53, 17 S.Ct. 235, 41 L.Ed. 624 (1897) (fictitious deposit); *Coffin v. United States*, 162 U.S. 664, 683–685, 16 S.Ct. 943, 40 L.Ed. 1109 (1896); *United States v. Austin*, 585 F.2d 1271, 1274–1278 (5th Cir. 1978) (recording worthless checks as cash assets on books and in report); *United States v. Sheehy*, 541 F.2d 123, 128–129 (1st Cir. 1976) (recording of unsecured loan as secured); *United States v. Bevans*, 496 F.2d 494, 498 (8th Cir. 1974) (omission of certain overdrafts from report); *United States v. Mayr*, 487 F.2d 67, 69 (5th Cir. 1974) (fictitious deposits); *United States v. Pappas*, 445 F.2d 1194, 1200, 1200–1201 (3d Cir.), *cert. denied sub nom. Mischlich v. United States*, 404 U.S. 984, 92 S.Ct. 449, 30 L.Ed.2d 368 (1971) (fictitious accounts receivable); *Phillips v. United States*, 406 F.2d 599, 600–601 (10th Cir. 1969) (fictitious loans); *United States v. Fortney*, 399 F.2d 406, 407–408 (3d Cir. 1968) (fictitious loans; false reporting

of cash assets); *United States v. Biggerstaff*, 383 F.2d 675, 678–679 (4th Cir. 1967) (fictitious loans); *United States v. Harter*, 116 F.2d 51 (7th Cir. 1940) (fictitious loans); *Billingsley v. United States*, 178 F. 653, 661–663 (8th Cir. 1910) (fictitious sales and deposits); *Morse v. United States*, 174 F. 539, 547–550 (2d Cir.), *cert. denied*, 215 U.S. 605, 30 S.Ct. 406, 54 L.Ed. 346 (1909) (fictitious purchases and loans; omission of stock held by bank in report).

8. *See, e.g., Coffin v. United States,* 156 U.S. 432, 462–463 (1895); *United States v. Manderson*, 511 F.2d 179 (5th Cir. 1975); *United States v. Biggerstaff, supra*, 383 F.2d at 678 (4th Cir. 1967); *Laws v. United States*, 66 F.2d 870, 873 (10th Cir. 1933); *Twining v. United States*, 141 F. 41 (3d Cir. 1905); *United States v. Scoblick*, 124 F.Supp. 881, 886 (M.D.Pa.1954), *aff'd*, 225 F.2d 779 (3d Cir. 1955); *United States v. Young*, 128 F. 111 (M.D.Ala.1904). *But cf. United States v. Hart*, 551 F.2d 738, 741 (6th Cir.), *cert. denied*, 434 U.S. 920, 98 S.Ct. 394, 54 L.Ed.2d 277 (1977).

tries proved under Counts 3 through 8 seem to fall within the latter category.

■ The prosecution was limited to the theory of falsity alleged in the indictment, *Stirone v. United States*, 361 U.S. 212, 218–219, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960), which was that the entries were false "in light of the true market value of the securities." As we have said, the disparity between the price and market value did not make the entry recording the purchase price false. The convictions under Counts 3 through 8 of the indictment are therefore reversed.

### III.

### *Sufficiency of the Evidence Under Counts 1 and 2: Intent*

The foregoing conclusion does not affect the convictions under Counts 1 and 2, which did not depend upon the proposition that the purchase orders and other records were false in that they do not show the difference between the purchase price and the market value of the acquired securities. Because we know from the jury's verdict on Count 2 that the verdict on Count 1 did not rest solely on a determination that the defendants conspired to commit the offenses charged in Counts 3 through 8, reversal of convictions on the latter counts does not require reversal on Count 1. *United States v. Dixon*, 536 F.2d 1388, 1401–1407 (2d Cir. 1976).

■ Defendants' only challenge to the sufficiency of the evidence under Counts 1 and 2 is that the requisite criminal intent was not proved. In addressing that subject in their brief, defendants do not discuss the evidence supporting the verdicts; rather they rely on other evidence and argue that the jury should have acquitted them. Viewing the evidence presented in the light most favorable to the jury's verdicts, we think it sufficient.

### *Count 1*

Conviction under Count 1 required proof that the defendants agreed to execute the sham transactions with the intent necessary for commission of the substantive crime of deception they allegedly conspired to commit.[9] *See, e.g., United States v. Feola*, 420 U.S. 671, 686–696, 95 S.Ct. 1255, 43 L.Ed.2d 541 (1975); *United States v. Zarattini*, 552 F.2d 753, 760 (7th Cir. 1977). The evidence presented was sufficient to support the inference that they acted with the intent to cause the filing of financial statements that would not disclose the sham nature of the overtrade prices and thus with the intent to conceal losses that otherwise would appear and thereby to deceive readers of the financial statements. Defendants' purpose and motive in agreeing to execute the sham transactions was to conceal the anticipated $800,000 loss on the short sales.[10] If successful, the scheme would necessarily result in materially false financial statements; otherwise the losses would not be concealed. Thus, the jury could well have inferred the necessary intent from the nature of the agreement proved.

Ironically, when it came time to issue financial statements for 1973 and file the 10–K Report, the threat of an $800,000 loss had disappeared and left in its wake another problem, *viz.*, the effect that full disclosure of the true nature of the overtrades would have on the financial statements. Nevertheless, even when they embarked on the conspiracy, the defendants could hardly

---

9. The trial court instructed the jury that specific intent, defined in the conventional way, *see United States v. Arambasich*, 597 F.2d 609 (7th Cir. 1979), was an element of both substantive offenses charged. While something less was required for the Securities Exchange Act charge alleged in Count 2, *see United States v. Schwartz*, 464 F.2d 499, 509 (2d Cir.), *cert. denied*, 409 U.S. 1009, 93 S.Ct. 443, 34 L.Ed.2d 302 (1972), the distinction does not affect the result here because we think the evidence sup-

ports the jury's apparent finding that defendants acted with the specific intent described in the judge's instructions.

10. Defendants' testimony that the purpose of the overtrades was to increase the bank's liquidity could properly have been disbelieved by the jury. That testimony was discredited by evidence that many of the securities received in overtrades matured later than the securities traded for them.

have intended such disclosure, for it would have defeated the purpose of the overtrades. At least the jury could have inferred that the defendant bankers were not so unsophisticated as to believe that financial records and statements that reported the purchases and sales at sham figures without disclosing the real nature of the transactions were not false, especially when their purpose in doing so was to conceal what they believed would otherwise appear as a substantial loss.

In addition, defendants' own false explanations of the overtrades could properly have been viewed as persuasive evidence of their consciousness of wrongdoing. These consisted of Wilson's disingenuous "thinmarket" memorandum to Ernst & Ernst, and Erickson's later explanation to the same effect to the Arthur Andersen partner.[11]

Defendants rely heavily on the difference of opinion between Ernst & Ernst and Arthur Andersen as to what kind of transaction can be deemed a repurchase agreement. The overtrades were not recorded as repurchase agreements, however, and there is no suggestion that either Wilson or Erickson regarded them as such when the conspiracy was formed or when the overtrades were executed. The later difference of opinion between the two accounting firms is of little relevance to the intent with which the conspiracy was entered into. Similarly, defendants argue that because Ernst & Ernst knew of the overtrades before the 1973 financial statements were filed, the jury could only conclude that they acted in good faith reliance on the accountants. As noted above, however, the defendants did not consult Ernst & Ernst until

after the overtrades were executed. Whatever Ernst & Ernst's position would have been had defendants consulted them, it has little bearing on what intent defendants had in agreeing to engage in overtrading and to falsely report the transactions.

### Count 2

Count 2 requires proof that defendants wilfully and knowingly filed and caused to be filed a materially false and misleading 10-K Report by understating the bank's losses for 1973. Much of what we have said applies to this substantive count as well. Under this count, however, the prosecution must prove that the actual filing or the act of causing false or misleading financial statements to be filed was done "wilfully and knowingly."[12]

The defendants argue that, although technically they issued the financial statements, it was not they but Ernst & Ernst who decided how to treat the overtrades in the financial statements and who approved treatment by giving its favorable opinion on the financial statements. The judge had instructed the jury that a good faith defense would be established by proof that Ernst & Ernst was selected in good faith as a competent accounting firm and knew of the transactions, and that defendants gave Ernst & Ernst the facts and relied on that firm to make the proper entries and adjustments in the financial statements. The jury found that defendants had not acted in good faith, and we think the evidence permitted such a finding. There was, as we have noted, evidence of specific misrepresentation by the defendants concerning the nature of the overtrades. Although Ernst

---

**11.** Erickson couched the explanation in terms of what "Wilson said." But since he was well aware that the explanation was not only misleading but blatantly inaccurate, the jury would have been justified in ignoring the attribution.

**12.** No proof of specific intent to violate the securities laws is necessary. *See United States v. Schwartz*, 464 F.2d 499, 509 (2d Cir.), *cert. denied*, 409 U.S. 1009, 93 S.Ct. 443, 34 L.Ed.2d 302 (1972).

It is not clear whether the requirement that defendants act "knowingly" adds anything at

all to the requirement that they act "wilfully." *See* 3 Loss, *Securities Regulation* 1986–1987 (1961); ALI, Model Penal Code (Proposed Official Draft) § 2.02 (1962). *But see, United States v. Dixon, supra,* 536 F.2d at 1396, in which Judge Friendly suggests that the term "knowingly" requires something akin to fraudulent intent.

Here the trial court instructed the jury that it does. *See* note 9, *supra.* The proof of intent is adequate even under the stricter standard.

& Ernst memoranda indicate that the firm knew that overtrades had taken place, the jury might properly have found that the firm was misled by Wilson's misrepresentations as to the absence of a reliable market price, and this in turn influenced the firm's view of the materiality of the matter. Although Erickson's representations to Arthur Andersen were made later, Wilson's actions in furtherance of the conspiracy are of course attributable to both of them. The accountants' failure to require disclosure of the sham character of the transaction, in view of the amounts involved, is inexplicable if they were aware of the facts, and so the jury might have believed.

■ Although certified by accountants as prepared in accordance with generally accepted accounting principles, the financial statements are nevertheless the representations of management. *See, e.g., In the Matter of McKesson & Robbins: Report on Investigation* 423 (1940). If a company officer knows that the financial statements are false or misleading and yet proceeds to file them, the willingness of an accountant to give an unqualified opinion with respect to them does not negative the existence of the requisite intent or establish good faith reliance, *See United States v. Colasurdo*, 453 F.2d 585, 594 (2d Cir. 1971), *cert. denied*, 406 U.S. 917, 92 S.Ct. 1766, 32 L.Ed.2d 116 (1972). Here defendants knew that they had in substance bartered securities for other securities. They knew they had recorded these transactions as if they were genuine purchases and sales at prices higher than the market prices of the securities. They knew therefore that the cost of the acquired securities and the corresponding loss on the sold securities were not accurately reflected in the records of the transactions. Thus, they knew that unless adjustments were made on the financial statements to reflect the foregoing facts the losses on the sales would be understated and that the carrying value of the securities purchased would be overstated. From all this the jury could have inferred that defendants, knowing that the financial statements were false and misleading, wilfully filed them with the intent to conceal the bank's losses on its securities transactions. That Ernst & Ernst certified the financial statements without requiring any adjustments, did not alter the fact that defendants knew the statements did not properly reflect the overtrade transactions.

As stated by the Second Circuit with respect to similar facts in *United States v. Colasurdo, supra,* "the question is ultimately one of honesty and good faith." 453 F.2d at 594. There was evidence on the basis of which the jury could properly find, notwithstanding the Ernst & Ernst advice and certification, that defendants knowingly and wilfully filed materially false and misleading financial statements.

For the foregoing reasons, and because we find no reversible trial error for the reasons stated in the unpublished order filed with this opinion, the judgments of conviction under Counts 1 and 2 are affirmed. The judgments of conviction under Counts 3 through 8 are reversed.